**UNITED STATES of America,**
**Plaintiff,**

**v.**

**LANPAR COMPANY et al., Defendants.**

**Civ. A. No. 3–2647–B.**

United States District Court
N. D. Texas,
Dallas Division.

Sept. 13, 1968.

As Amended Oct. 25, 1968.

Melvin M. Diggs, U. S. Atty., Kenneth
J. Mighell, Asst. U. S. Atty. Northern

District of Texas, Dallas, Tex., for plaintiff.

William P. Fonville, Dallas, Tex., for defendants.

## FINDINGS OF FACT, AS AMENDED

HUGHES, District Judge.

### I.

Lanpar Company, defendant, is a corporation organized and existing under the laws of the State of Texas and doing business at 2727 Mockingbird Lane, Dallas, Texas. Oren Parmeter, defendant, is Chairman of the Board and a Director of Lanpar Company and resides in Dallas, Texas. Carroll D. Brown, defendant, is President and a Director of Lanpar Company and resides in Dallas, Texas. Robert Bennett, defendant, is Vice-President and a Director of Lanpar Company and resides in Dallas, Texas.

### II.

Lanpar has been and is now engaged in Dallas, Texas in manufacturing, processing, packing, labeling, promoting, selling and distributing in interstate commerce products denominated Thyalis, parloid, digitalis, ethinyl estradiol, Thy-Odone, Ethimens, Progest-L, testosterone, Parmone, testradol, Thyrac, Racs, Trep-En-Ol, ammonium chloride, potassium chloride, phenobarbital, amobarbital, Phe-Bel, Cal-Trol, Bar-It, desoxyephedrine, Cellobese, Encholezyme, Glutain, Pepadain, As-Ma-Pa, Heplan, R. J., R.J–Nia, Cal-D, Biflav–C, Nia, Tein, Par-Li-Cin, Par-Up, Partein Powder, Partein Wafers, Par-Tab and Par-Amino.

### III.

A number of the products described in Paragraph II, when shipped in interstate commerce by the defendants are accompanied by package inserts and are labeled.

### IV.

Persons receiving the products described in Paragraph II from the defendants in interstate commerce also receive from the defendants, both initially and monthly, written, printed, or graphic material including Lanpar Clinical Reviews, Lanpar Technical Reports, Parmae Laboratory Reports and Bulletins, various leaflets, booklets and charts, as set out in Paragraph V of plaintiff's Complaint for Injunction. This written, printed or graphic material supplements and explains the use of the defendants' products in the treatment of obesity. In addition, such persons may receive tape recordings of symposia sponsored by the Lanpar Company which furnished information about intended uses of defendants' products. At these symposia physicians discuss use of thyroid, digitalis and other products made by defendants in the treatment of obesity.

### V.

On January 31, 1966, the defendant, Lanpar Company, and the defendants, Oren Parmeter and Carroll D. Brown, entered pleas of guilty to two counts of a criminal Information charging them with shipping drugs which were adulterated in violation of 21 U.S.C. § 331(a) in that the methods used in and the facilities and controls used for their manufacturing, processing, packing and holding did not conform to and were not operated and administered in conformity with current good manufacturing practices as required by 21 U.S.C. § 351(a) (2) (B).

### VI.

Various inspections of the Lanpar Company plant at 2727 Mockingbird Lane, Dallas, Texas, were made by Inspectors of the Food & Drug Administration. The last inspection took place during the period February 9 through February 14, 1968. This inspection disclosed that the methods, facilities, and controls used by Lanpar Company for the manufacturing, processing, packing, labeling, and distribution of said drugs were inadequate in the following respects:

a. The compression room was dusty and inadequate to minimize mixups between different drugs.

b. Plastic bags used in packaging were reused.

c. Samples for assays were taken only at the beginning of a tablet compression run rather than throughout the run.

d. There were instances of long periods of time between packaging and release for shipment.

e. Assays were not performed for vitamin D in Cal-D nor for belladonna in phebel.

f. Two batches of Cal-Trol were shipped when the records of Lanpar showed that disintegration of individual tablets did not take place within the time provided by company guide lines.

g. Notations on a batch record of Cal-D were not initialed and dated and the weight record was not in file.

h. In the record of a batch of Trep-En-Ol an ingredient was stricken and another inserted with no explanation for the change. Tablets were shipped with labels containing the original ingredients. Doctors receiving such drugs were not instructed to return them, but one year later were sent different labels to put on the bottles.

i. The pyrogen testing room was considered inadequate for proper testing because of a lack of humidity and temperature control.

j. There were instances of records showing actual yield being as much as 30% below theoretical yield.

k. The packaging operation was inadequate in that different products similar in appearance were packaged on four packing machines in close proximity to one another and not separated by physical partitions.

l. A sample of potassium chloride, collected from open stock failed to meet the standard established in the United States Pharmacopia for tablet disintegration.

m. A sample of Thyalis from open stock was found to contain an odd tablet of different size and color from other tablets in the package.

### VII.

After the inspection of February 1968 by the Food & Drug Administration and prior to the time of trial steps have been taken by Lanpar to improve procedures in its Dallas plant including the following:

a. Additional equipment has been installed and improvements made in the building.

b. Plastic bags are not reused in packaging.

c. Assays on two batches of Cal-Trol for belladonna have been made and instructions have been given that assays for belladonna must be made.

d. Complete partitions now separate each tablet compressing machine to prevent mixups of different drugs.

e. Packaging machines are now separated.

f. Batch packaging records have been redesigned to prevent errors.

g. Cal-D is now being sent to a biological laboratory for checking for vitamin D potency.

h. A program of representative stability tests is now being set up.

i. The storage area has been completed and additional lighting has been placed in the area.

### VIII.

Samples of Cal-D, Par-Tab, digitalis, cellobese, Sp Rx 2099, Trep-En-Ol. Cal-Trol, Sodium Liothyronine and Sp Rx 2123, which had been shipped in interstate commerce by Lanpar Company were tested and their strength was found to fall below that which they were purported to possess.

### IX.

The active ingredients of all of the products manufactured by the defendants except for oyster shells and a small proportion of the thyroid glands employed are received by the defendants at Dallas, Texas, from sources outside of the State of Texas.

### X.

The Lanpar Company sells the articles manufactured by it to licensed physicians and pharmacies.

## XI.

The Lanpar Clinical Reviews recommend and suggest the use of all of the defendants' products except Sp Rx 2099, Trep-En-Ol, and Sodium Liothyronine in the Lanpar program for obesity.

The Clinical reviews and the transcript of the New York Symposium of July, 1965 show this program to provide for the patients' medical history to be recorded on forms supplied by the Lanpar Company, for the patient to be weighed and measured, and for his blood pressure and pulse to be determined at the time of his initial visit. Further laboratory tests such as electrocardiograms, blood tests, including red and white cell counts, and hematocrit determinations, and urinalyses are sometimes suggested. No rigid diet or exercise routine is recommended. An initial regimen of medication is dispensed which provides for patients to receive from 2 to 10 grains of thyroid a day with a median dose of 3 grains a day and from zero to 2 grains of digitalis a day with a median dose of ¾ of a grain a day. In practically all cases a fixed dosage combination of thyroid and digitalis, thyalis, which contains 3 grains of thyroid and ¾ of a grain of digitalis is recommended for use.

Return visits are usually scheduled every 28 days although sometimes drugs are mailed to patients. On visits after the first visit, measurements of weight, blood pressure, pulse rate, and size of bust, waist and hips are recorded. Additional laboratory tests may be done. The daily dose levels of thyroid and digitalis are generally increased. After six months of Lanpar treatment the daily thyroid dose ranges from 3 to 14 grains with a median of 9 grains a day and the daily digitalis dose ranges from zero to 2 grains a day with a median of 1¼ grains per day. Recommended daily dose levels of thyroid reach 22 grains a day and that of digitalis reach 4 grains a day. Defendants also recommend addition of each of the drugs listed in Paragraph II of these findings in various combinations at various times throughout treatment pursuant to the Lanpar program for treatment of obesity. Further, on occasion, defendants also recommend use of thiazide diuretics in combination with their products.

Digitalis is used in the Lanpar program for obesity to cause loss of appetite. Users are told to treat digitalis as a safe drug and that dosage should be regulated according to the size of patients. Belladonna is intended to counter the side effects of digitalis. Thyroid is used to accelerate metabolism and burn off fat. Users are told that doses of thyroid ranging up to 30 grains a day may be given and that in patients with the heart pain of angina, thyroid can be given up to the point of precipitating an attack of heart pain.

Users are told not to inquire further into the way a patient on the program feels if he says he feels fine. They are advised to use double talk to avoid disclosing to patients, or to their physicians, what drugs such patients are being given pursuant to the program.

## XII.

The written, printed, and graphic matter referred to in Paragraphs III and IV of these findings do not furnish adequate directions for use for any of defendants' drugs referred to in Paragraph II of these findings, when such drugs are used or are intended to be used in the Lanpar program for treating obesity.

## XIII.

Administration of more than 3 grains of thyroid a day may induce an excessive amount of circulating thyroid hormone in the body and may reproduce, essentially, a disease called hyperthyroidism which may be manifested by increased metabolic rate, accelerated circulation, increased pulse pressure, loss of weight, nervousness, tremor, abberrations in reproductive function, and irregularities in heart rhythm. The foregoing manifestations are evidence of thyroid toxicity. The Lanpar regimen recommends use of from 1 to 30 grains of thyroid per day in the treatment of obesity.

#### XIV.

The administration of digitalis may induce digitalis toxicity. The manifestations of digitalis toxicity include loss of appetite, nausea, vomiting, diarrhea, abdominal pain, abnormalities of vision, and abnormal rhythms of the heart which is the way digitalis usually kills a patient. The administration of digitalis for the treatment of obesity is irrational and may be dangerous to health.

#### XV.

The addition of digitalis to thyroid as in the Lanpar program for treatment of obesity will increase the potential for toxicity in the body. Further, a fixed dosage combination of thyroid and digitalis is an irrational combination for which there is no valid medical use and may be dangerous to health.

#### XVI.

The written, printed and graphic matter referred to in Paragraphs III and IV of these findings does not contain information adequate to fully inform physician users about side effects, contraindications, or potential hazards that can reasonably be expected to attend the use of any of defendants' drugs referred to in Paragraph II of these findings when such drugs are used or are intended to be used in the Lanpar program for treating obesity.

#### XVII.

The labels and other written, printed and graphic material referred to in Paragraphs III and IV of these findings, taken together, contain statements which represent and suggest that the drugs referred to in Paragraph II can safely bring about weight loss without the benefit of rigid dieting, which representations are contrary to fact.

#### XVIII.

The labels and other written, printed and graphic material referred to in Paragraphs III and IV of these findings, taken together, contain statements which represent and suggest that obesity is usually a disorder of metabolism most commonly due to a derangement and disturbance of the gland system's synchronous function which statements are contrary to fact.

#### XIX.

The labels and other written, printed and graphic material referred to in Paragraphs III and IV of these findings, taken together, contain statements which represent and suggest that digitalis is a safe anorexic agent which statements are contrary to fact.

#### XX.

Many of the Lanpar Clinical Reviews contain recommendations and suggestions for the use of various combinations of defendants' products listed in Paragraph II, occasionally in combination with other drugs, in the treatment of obesity associated with various conditions such as hyperpituitarism, diabetes, hypothyroidism, heart problems and adolescence. Such recommendations and suggestions are false and misleading.

#### XXI.

The composition of the products listed in Paragraph II above is such that they are not generally recognized among experts qualified by scientific training and experience to evaluate the safety and efficacy of drugs as safe and effective for use under the conditions prescribed, recommended and suggested in the labels, written, printed or graphic materials and package inserts accompanying all of the defendants' products.

#### XXII.

The drugs thyroid and digitalis separately and in combination prior to the enactment of the Federal Food, Drug and Cosmetic Act of 1938 were subject to the Food and Drugs Act of June 30, 1906, as amended, and at such time the labeling of such drugs, separately and in combination contained the same representations concerning the conditions of their use as now.

#### XXIII.

All of the products listed in Paragraph II above are shipped by the defendants in interstate commerce.

### XXIV.

In the transactions involved in this case Oren Parmeter, Carroll D. Brown, and Robert Bennett acted in their capacities as officers of the corporation and in the course of their employment.

## CONCLUSIONS OF LAW, AS AMENDED

### I.

This Court has jurisdiction over the subject matter of this suit pursuant to the provisions of 21 U.S.C. § 332(a).

### II.

This Court has jurisdiction over all of the defendants herein since they all reside within the Dallas Division of the Northern District of Texas.

### III.

■ All of the articles listed in Paragraph II of the Findings of Fact with the exception of Par-Li-Cin, Par-Up, Tein, R. J.-Nia, Cal-D, Nia, Partein Powder, Par-Tab, Partein Wafers, and Par-Amino, are articles of drugs within the meaning of 21 U.S.C. § 321(g) (2).

### IV.

■ The drugs thyroid and digitalis separately and in combination are not new drugs within the meaning of 21 U.S.C. § 321(p) and do not violate 21 U.S.C. § 355.

### V.

■ The Lanpar products which are listed in Paragraph II of the Findings other than the exceptions listed in Conclusion III above are subject to the drug provisions of the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 301 et seq., the Current Good Manufacturing Practice Regulations for Finished Pharmaceuticals, 21 CFR 133.2–133.14, and all other applicable and valid drug regulations.

### VI.

■ All of the written, printed, and graphic material and package inserts referred to in Paragraphs III and IV of the Findings of Fact accompanying all of the products listed in Paragraph II of the Findings of Fact constitute labeling therefor within the meaning of 21 U.S.C. § 321(m).

### VII.

■ The active ingredients of all products listed in Paragraph II of the Findings of Fact, except for the oyster shells and a small portion of the thyroid glands employed by defendants, are held for sale after interstate shipment within the meaning of 21 U.S.C. § 331(k).

### VIII.

■ All of the products listed in Paragraph II of the Findings of Fact and the active components thereof are adulterated within the meaning of 21 U.S.C. § 351(a) (2) (B) in that the methods used in, and the facilities and controls used for, their manufacture, processing, packaging, and holding do not conform to and are not operated and administered in conformity with current good manufacturing practices to assure that such drugs and the active components thereof meet the requirements of the Act as to safety and have the identity and strength and meet the quality and purity characteristics which they purport or are represented to possess.

### IX.

■■ Samples of the drugs Cellobese, SP RX 2099, Trep-En-Ol, Sodium Liothyronine, and SP RX 2123 which were manufactured and shipped in interstate commerce by Lanpar are adulterated within the meaning of 21 U.S.C. § 351 (c), in that their strength differs from or their quality and purity falls below that which they purport and are represented to possess. A sample of digitalis tablets which Lanpar manufactured and shipped in interstate commerce is adulterated within the meaning of 21 U.S.C. § 351(b) in that its strength differs from and its quality falls below the standard established for it in the *U.S.P.* All of the aforementioned drugs are misbranded within the meaning of 21

U.S.C. § 352(a) in that their labeling contains false and misleading representations with respect to the strength, quality and purity of said drugs. By introducing said drugs into interstate commerce defendants violated 21 U.S.C. § 331(a).

### X.

Samples of the potassium chloride tablets, U.S.P., 5 gr., 10 gr., and 15 gr., which were manufactured by the defendants are adulterated within the meaning of 21 U.S.C. § 351(b) since they fail to meet the standard set forth in the *U.S.P.* for tablet disintegration. A sample of the drug Thyalis which was manufactured by the defendants was adulterated within the meaning of 21 U.S.C. § 351(c) in that it contained an odd tablet. All of these drugs are misbranded within the meaning of 21 U.S.C. § 352 (a) in that the labeling for said samples contains false and misleading representations with respect to the quality of said drugs by manufacturing and holding said drugs for sale. After interstate shipment of active ingredients the defendants violated 21 U.S.C. § 331(k).

### XI.

All of the drugs listed in Paragraph II of the Findings of Fact are misbranded within the meaning of 21 U.S.C. § 352(a) in that the labeling for such drugs contains false and misleading statements. By introducing such misbranded drugs into interstate commerce, defendants violate 21 U.S.C. § 331(a). By distributing and causing such labeling to accompany such drugs, defendants violate 21 U.S.C. § 331(k).

### XII.

Defendants' drugs designated as Thyalis, and Digitalis Leaves are misbranded within the meaning of 21 U.S.C. § 352(j) in that said drugs are dangerous to health when used in the dosage and with the frequencey and duration prescribed, recommended, and suggested in the labeling thereof and in as much as the drugs do not contain an adequate warning of potential side effects. By introducing such drugs into interstate commerce, defendants violate 21 U.S.C. § 331(a). By distributing and causing such labeling to accompany such drugs, defendants violate 21 U.S.C. § 331(k).

### XIII.

All of the drugs listed in Paragraph II of the Findings of Fact are misbranded within the meaning of 21 U.S.C. § 352(f) (1) in that the labeling for such drugs does not furnish adequate directions for use in the Lanpar program for the treatment of obesity. None of the drugs are exempt from the requirements of 21 U.S.C. § 352(f) (1) since their labeling does not contain information adequate to inform physician users about side effects, contraindications or potential hazards that can reasonably be expected to attend use of defendants' drugs in the Lanpar program in the treatment of obesity. By introducing such misbranded drugs into interstate commerce defendants violated 21 U.S.C. § 331(a).

The United States is entitled to an injunction restraining and enjoining Lanpar Company as follows:

1. From introducing or causing to be introduced into interstate commerce any of the products set out in Paragraph II of the Findings until the method used in, and the facilities and controls used for, their manufacture, processing, packaging and holding conform to and are operated and administered in conformity with current good manufacturing practices to assure that such products meet the requirements of the Act as to safety and have the identity and strength and meet the quality and purity characteristics which they purport or are represented to possess. This order will be suspended for ninety days in order to afford Lanpar Company a reasonable time to bring their manufacturing practices into conformity with current good manufacturing practices by correcting the deficiencies outlined in Paragraphs VI and VIII of the Findings.

2. From causing any of the drugs set out in Paragraph II of the Findings to be accompanied by the following written, printed and graphic matter; Lanpar Technical reports and bulletins; Lanpar Clinical Reviews, and leaflets, which have previously been sent to physicians. In this connection Lanpar shall recall and destroy all such Reviews, Reports, Bulletins and leaflets previously sent to customers.

3. From writing, printing, distributing or causing to be distributed any written, printed, or graphic matter enumerated in Paragraph II of the Findings or any other written, printed, or graphic matter which contains statements which represent and suggest that any of said drugs, singly or in combination are safe and effective in the treatment of hyperthyroidism, amenorrhea and hypomenorrhea; can safely bring about weight loss without the benefit of rigid dieting; that obesity is usually a disorder of metabolism and that use of said drugs will cause a change toward the normal metabolism; that obesity is most commonly due to a derangement and disturbance of gland system synchronous function, since each gland must work in harmonious collaboration with the other endocrine glands in order to produce perfect functional balancing and that obesity results when faulty secretions interfere with the proper utilization of stored fats; that if the gastro-intestinal and glandular balance were perfect, weight would be normal, that digitalis safely and satisfactorily curtails hunger and appetite and is practically devoid of untoward results; and that said drugs are safe and effective adjuncts in the treatment of all obesity; which statements are false and misleading since said drugs are not safe and effective for such purposes, and since the statements are otherwise contrary to fact.

4. From causing Thyalis or any combination of thyroid and digitalis to be sold or delivered in interstate commerce. In this connection Lanpar is ordered to have all drugs containing a combination of thyroid and digitalis returned and destroyed.

5. From causing digitalis to be sold or delivered in interstate commerce for the treatment of obesity or if Lanpar has reason to believe such drug will be used in the treatment of obesity.

6. Lanpar is directed to re-word labels on bottles so as to include the following:

a. On all bottles of digitalis:

"Warning: Not to be used for obesity. The administration of digitalis may induce digitalis toxicity. The manifestations of digitalis toxicity include loss of appetite, nausea, vomiting, diarrhea, abdominal pain, abnormalities of vision, and abnormal rhythms of the heart. Any side effect should immediately be called to your physician's attention."

Dosage—as prescribed by physician.

b. On all bottles of thyroid drugs:

"Warning: Not to be used in hyperthyroid patients for the treatment of obesity. Excessive administration of thyroid may induce an excessive amount of circulating thyroid hormone in the body and may reproduce, essentially, a disease called hyperthyroidism which may be manifested by increased metabolic rate, accelerated circulation, increased pulse pressure, loss of weight, nervousness, tremor, abberrations in reproductive function, and irregularities in heart rhythm. Any side effect should immediately be called to your physicians attention."

Dosage—as prescribed by physician.

7. From the sale by Lanpar of digitalis and thyroid drugs in bulk, so as to insure labeling on each container received by the ultimate customer.

The Complaint against the individual defendants shall be dismissed.