**UNITED STATES of America,**
**Plaintiff,**

v.

**LIT DRUG COMPANY, a corporation,**
**et al., Defendants.**

**Civ. A. No. 1120–71.**

United States District Court,
D. New Jersey,
Civil Division.
Sept. 24, 1971.

Herbert J. Stern, U. S. Atty., by William J. Hunt, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Bass & Ullman, by Robert Ullman, New York City, Herbert Alterman, Passaic, N. J., for defendants.

## OPINION

COOLAHAN, District Judge:

This action proceeds from certain admitted violations of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq. The government seeks to enjoin numerous irregularities practiced by defendants in violation of the Act, 21 U.S.C.A. § 331(a), (k). This Court has jurisdiction under 21 U.S.C.A. § 332(a).

The government filed its complaint for an injunction restraining defendants from their alleged illegal activities on July 27, 1971. This lengthy prayer for relief, supported by several detailed affidavits, charged defendants with manufacturing and holding for sale adulterated and misbranded drugs, within the meaning of 21 U.S.C.A. § 351(b), (c), (d) (2) and § 352(a), (f) (2), and with the unlawful introduction of these drugs into interstate commerce, in violation of 21 U.S.C.A. § 331(a). The government also alleged a violation of 21 U.S.C.A. § 331(k) in that defendants had adulterated or misbranded component drugs which it had received through interstate commerce. This Court granted the government's request for a Temporary Restraining Order which enjoined further interstate shipment of drugs by

defendant until certain conditions had been fulfilled. First, the methods, facilities and controls for manufacturing, processing, packaging, and labeling of defendants' drugs were to be brought in conformity with the current good manufacturing practices, as defined in 21 C.F.R. § 133.1–14. Specifically, but not exclusively, defendants were directed to correct ten deficient practices in their quality control and record keeping. As a second condition upon future interstate commerce, defendants were required to grant duly authorized Food and Drug Administration inspectors access to defendants' plant for the purpose of inspecting defendants' records, materials, equipment and labeling in order to insure, to the satisfaction of the government, that defendants had in fact realigned the operation of the plant in conformity with current good manufacturing practices. Third and finally, all the drugs on hand at defendants' plant site were to be subject to examination by officials of the Food and Drug Administration, assays were to be made in order to assure the safety, identity, purity, strength and quality of these drugs, and recalls were to be made of any line of drug determined to be adulterated or misbranded. These drugs would then likewise be examined and, if similarly defective, destroyed or brought into compliance with the law under the supervision of the Food and Drug Administration. The expenses for the inspecting, assaying and recall operations were to be borne by the defendants.

In view of the immediate threat to the public health and safety presented by defendants' alleged activities, and also considering the admittedly broad injunctive relief temporarily granted the government, a trial date within the next few days following filing of the complaint was fixed. Shortly before trial, however, the defendants and the government entered a Stipulation, vitiating the need for a fact finding, by which the defendants confessed virtually every wrongdoing attributed to them in the complaint. Paragraph Six of the Stipulation

recites the illegalities detected by Food and Drug Administration inspectors during nine visits to defendants' plant beginning in June 1970 and ending in May 1971. The evidence collected during that time is also set out in the numerous affidavits which formed the basis of the government's request for a Temporary Restraining Order on July 27, 1971. The length of Paragraph Six prevents a full, verbatim recitation of defendants' concededly unlawful activities, but some mention should be made to demonstrate that these illegalities ran the full gamut of the assembly line.

The defendants concede that they failed to provide written specifications for raw materials, failed to examine raw materials sufficiently prior to their release for manufacturing, and failed to assay raw materials and/or maintain assay records. Numerous quality control tests designed to insure uniformity, potency, purity and drug stability within each batch were either omitted or haphazardly performed, and in many instances, test results were incompletely or incorrectly recorded or not recorded at all. Where batch records failed to match specifications, the discrepancy was sometimes unexplained. Innumerable adulterations were discovered by the inspectors, many of which were found in such widely used drugs as reserpine and digitalis. It also appears that final inspections observed throughout the industry were not performed by defendants. Moreover, packaging and labeling controls were grossly deficient according to all inspectors. Incredibly, even those goods which failed laboratory tests were occasionally shipped out. The Stipulation stating these facts was filed on August 3, 1971. At that time the Court ordered, with the consent of the parties, that the Temporary Restraining Order continue in effect until an order of preliminary injunction was entered by the Court.

The government would have the Court continue the Temporary Restraining Order in the form of a preliminary injunction, but defendants oppose this action upon three grounds. First, defend-

ants maintain that while some form of injunctive relief is appropriate, that part of the injunction which directs defendants to operate their plant in conformity with "current good manufacturing practices" is too broad a command to be tolerable within the specificity requirement of Rule 65(d), Fed.R.Civ.Proc. Second, defendants argue that a restraint of interstate drug shipment until the government is satisfied that plant operation is within the confines of current good manufacturing practices is a procedure not authorized by the Federal Food, Drug and Cosmetic Act. Last, defendants claim that the injunction also exceeds the bounds of the Act in restraining the interstate shipment of drugs until all drugs presently in defendants' plant are assayed and defective lots are recalled to be destroyed or brought into compliance with legal standards. For reasons assigned herein, defendants' motion to limit the form and scope of the injunction is denied.

## THE BREADTH OF THE INJUNCTION

██ Defendants vigorously oppose what they regard as a loosely worded order. The complaint is that "current good manufacturing practices" presents no ascertainable standard of performance assuming defendants make a good faith effort to cooperate with FDA officials in complying with the sanctions with which it has no quarrel. Because they are reputedly without guidelines, the defendants fear they are left "at the peril of a summons of contempt."

The form and scope of injunctions or restraining orders issued by federal courts is governed by Rule 65(d) of the Fed.R.Civ.Proc., which states in pertinent part:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained. * * *

Historically, the specificity rule may be traced to a concern for fair play; a party is more likely to disobey an order of the court when it cannot easily determine exactly what is expected of it. Correspondingly, court enforcement of its decree under such circumstances is bound to be either awkward or severe. As Professor Moore has observed, "[l]oose injunctive orders are neither easily obeyed nor strictly enforceable, and are apt to be oppressive." 7 Moore's Federal Practice ¶ 65.11 at p. 1666 (1970). But specificity, as demanded by Rule 65(d) and as envisioned by scholars like Professor Moore, is a matter relative to each case. Where, as here, the defendants have been engaged in an overt, long standing, schematic and unpenitent thwarting of the law, particularly a law enacted for the protection of an otherwise helpless consumer public, the specificity which defendants can respectfully demand under Rule 65(d) can hardly compare to that which might be afforded were there only a single, isolated infraction. None of the cases cited by defendants offers situations in which the public interest in barring adulterated or misbranded drugs from interstate commerce has been sacrificed or attenuated by an overbearing concern for tightly drawn orders bearing only enumerated violations.

Defendants rely on United States v. Article of Drug, etc., 362 F.2d 923 (3d Cir. 1966), also an action for misbranding. The court below had ordered the defendant to state, aside from the directions for proper uses claimed by the producer, directions for use in such "other conditions if any there be, for which such drug or device is commonly and effectively used." On appeal, the Third Circuit struck that part of the order as incomplete and insufficiently specific in itself. That result was clearly justified because insofar as defendant was required to anticipate the uses to which its drug would be put—uses which it by no means recommended— the order as prepared below required perceptiveness and intuition approach-

ing clairvoyance. In any event, the manufacturer certainly has the right to limit its product to specified uses and to disclaim others. Therefore, I find nothing in this case helpful to defendant.

Defendants also cite United States v. Vitasafe Corp., 345 F.2d 864 (3d Cir. 1965). This was initially an in rem action brought against certain misbranded vitamin-mineral capsules. The government then proceeded against the producer on the ground that accompanying labeling and advertisements were misleading. The court below enjoined not only the misleading statements specified but also all statements "otherwise false and misleading." The Third Circuit determined that this part of the order was insufficiently particular and thus offered no guidelines for compliance. While the wording of the injunction in *Vitasafe* which was struck appears on its face to raise objections similar to those presented by defendants in the instant case, the abuse(s) sought to be remedied and the evil of overbreadth to be guarded against in each case are strikingly different. While misbranding is an obvious threat to public health, the prohibition against misbranding is certainly not as susceptible to repeated violations as in the case of adulteration. In misbranding cases, it is a relatively simple matter for the court to fashion an order which shall proscribe the false or misleading material. United States v. Lanpar Co., 293 F.Supp. 147, 155 (N.D. Tex.1968). Supervising compliance is also relatively easy. The facts in this case alone are excellent proof that a narrowly worded order enjoining adulteration, on the other hand, can hardly curb the reckless infractions of a highly culpable drug manufacturer, whether his adulterating tactics are ingenious or ingenuous. Similarly, considering the multifaceted imperfections of the Lit Drug plant operation, and considering also the innumerable possible defects which may be located in the future, it would be extremely impractical to ask the FDA, which must supervise compliance, to bring a new action for each added infraction detected, no matter how small or no matter how closely incident to past violations. This proposition was neatly summarized by the court in United States v. Hill, 298 F.Supp. 1221 (D. Conn.1969), in which the Securities and Exchange Commission had asked for and received an injunction closely worded to Sections 5(a), (c) and 17(a) of the 1933 Act, with the enumeration of a few additional unlawful practices. The question before the court in the case was whether the injunction had been violated. This depended, naturally, on whether a liberal or strict construction would be given to the statutorily worded order:

> In today's complex society it would be unreasonable to require injunctions to be more specific than that utilized here. There are an unlimited number of techniques which can be used to distribute unregistered securities or to make fraudulent representations when selling securities. * * * No injunction could be written anticipating all such techniques, and any injunction which attempted to would be far broader and more harsh on the defendant.

*Id.* at 1236. In United States v. Bel-Mar Laboratories, Inc., 284 F.Supp. 875, 883, (E.D.N.Y.1968), the court noted the observation of a prominent drug industry commentator that highly specified injunctive relief is impossible because of the great strides made by the industry in recent years and the great variety of circumstances under which those changes have been adopted. Likewise, I feel compelled to admit that defendants' imaginative capacity for contravening our federal drug laws has outrun this court's capacity for more explicit cautioning than provided in the injunction. Far from being ignorant of what is expected of them under the law, the defendants are in fact no "strangers to the Federal Food, Drug and Cosmetic Act." A brief account of defendants' recent involvement with the enforcement of the Act will testify to their familiarity.

In his affidavit, Weems L. Clevenger, Director of Food and Drugs, Region II, who is responsible for the day-to-day enforcement of the Food, Drug and Cosmetic Act in an area encompassing New York and New Jersey, describes the FDA's surveillance of defendants' plant operation. Mr. Clevenger states that since the operation of the plant at its Union, New Jersey location for the past five years the firm has continually violated current good manufacturing practices. Only during a brief span of months in 1968 involving rigorous supervision did the FDA consider Lit Drug Company to be in compliance with the law. A total of nine inspections were deemed necessary from June 15, 1970 through May 19, 1971. Each inspection revealed serious operational deficiencies, as earlier recounted. Since August 1969, Lit Drug, under pressure from the FDA, has made fifteen voluntary recalls of adulterated prescription and non-prescription drugs. The FDA conducted three hearings to deliberate over the violations of current good manufacturing practices incurred by Lit Drug, and on each occasion, the management replied that the deficiency would be corrected. As a result of a visit by inspection officials on January 22, 1971, the government filed a complaint for the forfeiture and condemnation of numerous drug batches and manufacturing equipment pursuant to 21 U.S.C.A. §§ 334(a) (2) (A), 372(e) (5). United States v. Articles of Drug, etc., Civ. Action No. 123–71 (D.N.J. Jan. 27, 1971). A consent decree was entered. In early April the government then filed a criminal complaint against Lit Drug setting forth three counts of improper and inadequate record keeping in violation of 21 U.S.C.A. §§ 360a(d) (1), 331(q) (4), 333(a). United States v. Lit Drug Co., Crim.No. 239–71 (D.N.J. Apr. 8, 1971). Lit Drug pleaded guilty on all three counts and was fined $3000 by this Court. And, of course, there is this present action, by which defendants stipulate their failure or refusal to abide by the repeated warnings of the FDA regarding innumerable, serious violations. Clearly, the grave, apparent, and immediate threat to public health and safety in this case is incomparable to that faced by courts in such cases as *Vitasafe, supra,* and the scope of the injunction must necessarily be broadened to accommodate this wider interest.

The danger of overbreadth, which confronted the Third Circuit in *Vitasafe,* is missing in this case. Unlike misbranding, "current good manufacturing practices" is a term of art within the industry. The drug industry is well aware of what is meant by current good manufacturing practices, and there is every reason to believe that reputable manufacturers have welcomed the efforts of the FDA in defining that phrase by regulations promulgated by the Secretary of Health, Education and Welfare under the Act. 21 C.F.R. § 133 (rev. 1971). Misbranding, on the other hand, is nowhere defined so elaborately in regulations, but is only incidentally defined by scattered references or examples. By and large, the metes and bounds of misbranding are delineated by case law.

An examination of the Regulations in depth reveals a history of governmental and industrial cooperation; these regulations were not adopted in the abstract, but in the context of an ongoing mutual educational program, by which the industry's more progressive practices were gradually developed into a uniform code. United States v. Bel-Mar Laboratories, Inc., *supra,* at 883. A few courts have considered this question, whether an injunction may refer incidentally to regulatory law, and the weight of authority favors this growing technique.

The court in United States v. Lanpar Co., *supra,* found that numerous drugs produced by defendants were adulterated within the meaning of 21 U.S.C.A. § 351 (a) (2) (B). The court granted the government's request for an injunction prohibiting interstate drug commerce

    \* \* \* until the method used in, and the facilities and controls used for, their manufacture, processing, pack-

aging and holding conform to and are operated and administered in conformity with current good manufacturing practices to assure that such products meet the requirements of the Act as to safety and have the identity and strength and meet the quality and purity characteristics which they purport or are represented to possess.

*Id.* at 154. The court suspended the operation of this order for ninety days so that defendants could align plant procedures with current good manufacturing practices by correcting the deficiencies specifically enumerated in the court's finding of facts. However, it cannot be inferred from a fair reading of the injunction that the court intended this reference to specific findings in any way to limit its overall mandate that defendants observe current good manufacturing practices in the future.

Other courts, in enforcing regulatory legislation, have used little more than a recitation of statutory language in wording injunctions and have not regarded this practice as offensive to Rule 65(d). United States v. Hill, *supra;* United States v. Schlicksup Drug Co., 206 F.Supp. 801 (S.D.Ill.1962); United States v. Sherwood, 175 F.Supp. 480 (S.D.N.Y.1959). And if there is reason for defendants to fear that borderline activities may violate the injunction, an advisory opinion may be sought from the regulatory agency. United States v. Hill, *supra.*

While recitation of the statute wholly and without modification would run contrary to Rule 65(d), regulations may provide a legally sufficient guideline. This distinction is apparent in Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508 (5th Cir. 1968), which was an action brought to enforce the Fair Labor Standards Act. Defendant had failed to keep proper records and had employed underaged workers. The court held that the reference to the Act by the lower court in forming its decree enjoining further

prohibitions was not fatal to the decree's validity because

\* \* \* the injunction does not engraft the statute in gross, \* \* \* or rely on the statute for clarification of what is otherwise unclear in the decree itself. It merely supplements specific instructions in the decree with statutory authority from which the right to issue such instructions derives. The statutory material is thus given as a parenthetical reference, not as a substantive command.

*Id.* at 517. (Citation omitted). However, if the statutory references are deleted from the court's injunction (*id.* at 517 n. 10), the only instructions remaining for the keeping of records are the regulations issued by the Administrator of the Wage and Hour Division of the Department of Labor. That result is therefore entirely consistent with Fleming v. Salem Box Co., 38 F.Supp. 997 (D.Or.1940), in which the government properly consented to strike from a similar injunction language which enjoined any and all violations of the Fair Labor Standards Act.

A word should also be mentioned about defendants' "peril of a summons of contempt," particularly since specific intent is not an element of proof. This Court has already itemized defendants' past Food, Drug and Cosmetic Act transgressions. They are sufficiently severe and close in time together that the Court can only suspect that defendants are either unwilling or unable to comply with the law. If the threat of contempt citations seems harsh, it is because apparently no less a threat will serve to protect the public health and safety. If defendants assume a difficult burden, it is only because of the jeopardy to which defendants have subjected the general public by their repeated utterly careless disregard for the law. That the Act is to be construed with a special regard for preventive action in the public interest is a message frequently heard from both the legislative and judicial branches, as well as from those responsible for enforce-

ment. *See, e. g.*, 1962 U.S.Code Cong. & Adm.News, p. 2884; United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). The argument that enforcement of regulatory standards by contempt proceedings, where specific intent was not an element of proof, is an unjustified hardship was emphatically rejected in United States v. Custer Channel Wing Corp., 247 F.Supp. 481 (D. Md.1965), aff'd 376 F.2d 675, (4th Cir.), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967). Defendants there were enjoined from making use of interstate transportation or communication in aid of its sale of stock until they had filed a registration statement deemed satisfactory by the Securities and Exchange Commission. The government then sought to institute contempt proceedings for an alleged violation of the injunction, which apparently did little more than to incorporate statutory and regulatory law references. The court did not think such prosecution was unfair:

> The power to punish for violations of an injunction enjoining transgression of § 5 of the Act should not be less than the power to enforce § 5 of the Act by criminal sanctions. Both have the same ultimate objective—protection of the investing public—so that a greater quantum of proof or additional elements of proof should not be required in the former proceeding as contrasted to the latter. * * * An injunction like the original injunction here is granted only because there is a showing, *inter alia*, of more than a remote possibility of future harm. The person enjoined is put on notice that his past acts have violated the law, and that there is a substantial likelihood of future violation. No concept of basic fairness is violated by requiring a person in this position to be more than normally careful in his future conduct. Moreover, the Court's power to do justice by granting injunctive relief would be seriously embarrassed, if not destroyed, by a requirement of greater proof to show a violation of the injunction than to show a

violation of the statute incorporated into its order.

*Id.* at 496. Most important, 21 U.S.C.A. § 332(b) carves an important exception out of 18 U.S.C.A. § 3691, which provides that violators of orders obtained on behalf of the United States are subject to summary contempt proceedings. However, 21 U.S.C.A. § 332(b) allows such a violator a jury trial if demanded where violation of the order also constitutes an infraction of the Food, Drug and Cosmetic Act. Since the duty written into the order to which defendants object, the observance of current good manufacturing practices, forms a distinct obligation under the Act, defendants are assured of a jury duty on that score. 21 U.S. C.A. § 351(a) (2) (B).

## RESTRAINT OF INTERSTATE COMMERCE UNTIL FULL PLANT INSPECTION BY FDA OFFICIALS AND COMPLIANCE WITH CURRENT GOOD MANUFACTURING PRACTICES

■ Defendants contest that part of the proposed order which restrains Lit Drug from engaging in interstate commerce until FDA officials have made a thorough plant inspection of all equipment, materials, labels, containers and procedures and are satisfied that such are in compliance with current good manufacturing practices. Defendants attack this as pre-screening not authorized by the Food, Drug and Cosmetic Act, and take the view that this Court under 21 U.S.C.A. § 332 may only enjoin illegal activities and leave defendants to risk a contempt citation in the event of non-compliance. This narrow construction of § 332 is not only unjustified but plainly hostile to the intent of Congress in enacting the Food, Drug and Cosmetic Act. Effective deterrence as a weightier and more beneficial weapon against drug adulteration than criminal sanctions is a message that pervades the legislative history of this Act. *See generally* 1962 U.S.Code Cong. & Adm.News, p. 2884. Congressional concern for the *manner* in which a drug is produced, aside from a

consideration of the composition of the drug, is apparent in the new language of 21 U.S.C.A. § 351(a) (2) by which a drug is deemed adulterated if it has been processed, packed or held under unsanitary conditions, or if any manufacturing, packing or holding method does not conform to current good manufacturing practice. Thus a drug may be pharmaceutically perfect in content but still be regarded as adulterated under the law. Congress preferred this approach rather than rely upon governmental intervention once the injurious drugs had entered the stream of commerce. The emphasis upon precautionary measures is evident. It is equally apparent that Congress concluded that, as is the case here, such legal machinery would be necessary where the drug manufacturer was either incapable or unwilling to comply with the law. *See* 1962 U.S.Code Cong. & Adm.News, pp. 2884, 2890. A liberal construction of the Act is justified by its preeminently consumer conscious purpose. As the Supreme Court noted in the oft-quoted case of United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134 (1943):

> The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words.

*Id.* at 280, 64 S.Ct. at 136. And in United States v. Sullivan, 332 U.S. 689, 694–695, 68 S.Ct. 331, 92 L.Ed. 297 (1948), the Supreme Court again reiterated its concern for the ultimate consumer, and added that it would give the Act a broad construction because it had confidence that the Administrator would, as Congress intended, concentrate his efforts on serious violations rather than mere technical infractions. Again, this theme was repeated in the later case of United States v. Urbuteit, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61 (1948), where the Supreme Court said: "The Act is not concerned with the purification of the stream of commerce in the abstract. The problem is a practical one of consumer protection, not dialectics." *Id.* at 357–358, 69 S.Ct. at 114. Because there is no evidence that the restraint upon interstate commerce until adequate inspection has been made is repugnant to the language of 21 U.S.C.A. § 332(a), and because there is every reason to believe that it is entirely consistent with congressional intent in preventing drug adulteration, I cannot agree with defendants that the order exceeds the authority enacted in the statute in this respect.

There is hardly a more settled, indelibly written principle of equity than that which declares that a court must mould its decree in accordance with the specific public interest to be served. *E. g.*, United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939). Moreover, where there is a history of repetitive, flagrant violations, where there is a real danger of recurrent violations evidenced by defendant's evasion of the law, and where the nature of such possible future violations cannot be anticipated with exactitude, many courts have greatly broadened the injunctive relief given the government in enforcing regulatory legislation. In speaking as to the propriety of issuing an injunction to enjoin Section 8 violations of the Clayton Act, which forbids interlocking corporate directorates, the Supreme Court in United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) noted that the danger of recurrent violations was to be considered, along with the sincerity of assurances of compliance, the effectiveness of withholding relief as requested by the government, and the character of past offenses. Similarly, the Court in N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 436, 61 S.Ct. 693, 85 L.Ed. 930 (1941), expressed the opinion that the breadth of an injunction must properly account for the future violations similar or related to those which the govern-

ment presently seeks to have enjoined. To the same effect is N.L.R.B. v. United Mine Workers, 202 F.2d 177 (3d Cir. 1953). The law is also clear that a court must effectively safeguard the public interest against the abuses inflicted by a willful, persistent violator of regulatory legislation who has not shown good faith in compliance. May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 391, 66 S.Ct. 203, 90 L.Ed. 145 (1945), reh. denied, 326 U.S. 811, 66 S.Ct. 468, 90 L.Ed. 495 (1946). The Fifth Circuit in Gulf King Shrimp Co. v. Wirtz, *supra*, recently commented upon the propriety of an injunction against violations of the child labor and record keeping provisions of the Fair Labor Standards Act, 29 U.S.C.A. §§ 211, 212:

> [I]t must be said that this is neither a case of prompt compliance, * * * nor of candid confession minimizing the likelihood of future violations. * * * Such self delusions of innocence only underscore the urgent need, both now and in the future, for injunctive process.

407 F.2d at 516. (Citation omitted).

Defendants fear that inspection rights will give the government power of decision, in effect, to interdict future violations, if detected. While this Court does urge defendants to abandon whatever evasive schemes of noncompliance and noncooperation they may have pursued in the past, I can only reiterate that under 21 U.S.C.A. § 332(b) defendants are guaranteed a jury trial if any contempt proceedings are brought by the government. The facts in Buticaps, Inc. v. United States, 102 U.S.App.D.C. 253, 252 F.2d 634 (D.D.C.1958), upon which defendants rely for this point, are obviously inapposite. The government there sought to by-pass a judicial determination of misbranding before gaining an order for condemned goods to be seized.

## RESTRAINT UPON INTERSTATE COMMERCE UNTIL ASSAY OF DRUGS PRESENTLY IN THE LIT

## DRUG PLANT AND RECALL OF ASSAYED LOTS

Defendants complain against that part of the order which forbids interstate commerce until the FDA has had an opportunity to examine and assay all of the drugs presently being held at the Lit Drug plant and to recall those assayed lots which prove to be adulterated. Defendants do not quarrel with the government demand for a recall of drugs which the plant inspection reveals to be adulterated, but they do argue that this procedure is not related to the future production of drugs, inasmuch as the government has adequate safeguards in those parts of the injunction which direct defendants to make specific corrections. Insofar as the defendants argue that such procedure is not authorized by the Act their argument must fall for the reasons already assigned by this Court in the preceding discussion. Defendants rely chiefly upon Hygrade Food Products Corp. v. United States, 160 F.2d 816 (8th Cir. 1947), for the proposition that the order in the instant case is harsh and punitive rather than remedial. The defendant in *Hygrade* was charged with shipping unclean and contaminated dairy products in violation of the Food, Drug and Cosmetic Act. The court below recited numerous time-consuming, expensive ways in which the defendant had cooperated with the FDA in cleaning up its operations. It appeared to the court, however, that because of heavy competition within the industry, defendant was forced to accept contaminated milk from its suppliers. Therefore, the court entered an order restraining defendant from shipping milk in interstate commerce for two years. Defendant's good faith in that case was a matter of record, as the government was ready to concede that defendant was willing and capable to do everything necessary to put its plant in proper, sanitary order if it were not for the competitive pressure which forced defendant to violate the Act. The reviewing court simply held that in light of defendant's evident good faith, the two

**1000**

year restriction, from which defendant could not apply for a modification, was arbitrary and unjustified. Here, however, the time during which interstate commerce is restricted is clearly related to a valid objective. It may well be that the FDA has not yet uncovered all infractions of which defendants are guilty. At least in these extreme circumstances, where defendants have stipulated its marketing of drugs defective with innumerable adulterations, the facts give rise to this presumption. Hence, it is totally reasonable that the FDA should have an opportunity to examine and assay given lots both within the plant and from those drugs recalled, in order to assure the complete safety of defendants' future operations. Seen in this light, the examination and assay of drugs already manufactured is not so unrelated to the future production of drugs as defendants argue. Nor is there anything harsh or punitive in what the government requests. The Order will reflect this Court's continuing jurisdiction for the purposes of enforcement or modification of the Order.

Let an appropriate Order be submitted.