**UNITED STATES of America,
Plaintiff,**

v.

**C. E. B. PRODUCTS, INC., etc., et al.,
Defendants.**

**No. 74 C 1481.**

United States District Court,
N. D. Illinois, E. D.

July 26, 1974.

---

2. This sentence under Louisiana law is "without benefit of parole, probation or suspension of sentence." LSA–R.S. 14–64(B).

James R. Thompson, U. S. Atty., and Frederick Branding, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

R. Quincy White, Jr., Tomas M. Russell, Frederic J. Artwick and Jack R. Bierig, Sidley & Austin, Sidley & Austin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

This is an action under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., in which the government seeks to enjoin defendants' alleged violations of sections 301(a) and 301(k) of that Act. 21 U.S.C. § 331(a), (k). Jurisdiction of this court is founded upon 21 U.S.C. § 332(a).

This suit was instituted on May 30, 1974, by the filing of a complaint and a motion for a temporary restraining order. The complaint alleges that defendants, a corporation and two of its officers, are engaged in causing the manufacture of an article of cosmetic, within the meaning of 21 U.S.C. § 321(i), designated by the name "Long Nails". Said cosmetic is claimed to be adulterated within the definition of 21 U.S.C. § 361(a) in that the article contains a "poisonous or deleterious substance"—methyl methacrylate monomer—"which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual." *Id.*

■ The government maintains that defendants are violating 21 U.S.C. § 331(a) by introducing and delivering, or causing to be introduced and delivered, into interstate commerce an adulterated article of commerce. It is further averred that defendants are violating 21 U.S.C. § 331(k) by causing said cosmetic to be manufactured, packed and labeled, while it is held for shipment in interstate commerce, which acts result in the adulteration of the product. After extended hearings, this court found that a preliminary showing had been made that defendants had violated 21 U.S.C. § 331(a) and § 331(k) and issued a preliminary injunction prohibiting defendants from, *inter alia,* introducing, or delivering for introduction, into interstate commerce any of said cosmetic which contains methyl methacrylate monomer, and from manufacturing, packing and labeling said article from components that have been shipped in interstate commerce and which results in the article containing methyl methacrylate monomer.

The Government's prayer for relief also requested that the court order defendants to notify all persons, down to the retail level, to whom any of the cosmetic had been distributed, that the product contained a poisonous or deleterious substance and to "direct all such persons to return the article to the defendants." All parties, and the court, have viewed that paragraph as a demand for a judicially-ordered "recall" of those packages of Long Nails which may still be sitting on store or warehouse shelves. Defendants strenuously object to this demand, arguing that the court is without authority under the Federal Food, Drug and Cosmetic Act (hereinafter cited as "the Act" or "the FDCA") to order a recall, and that even if such authority exists, the court should decline to enter such an order as a matter of discretion. In light of the apparent novelty and the undoubted seriousness of this question, the court ordered briefs on the point and took the issue under advisement. After reviewing the memoranda of both parties, the court ruled orally from the bench that it had concluded that it possessed no power in the circumstances of this case to order a recall. This Memorandum Opinion is intended to set forth the reasons behind that conclusion.

The Government brought this suit for injunction pursuant to section 302(a) of the Act, which provides, in relevant part, that:

> "The district courts of the United States . . . shall have jurisdiction, for cause shown . . . to restrain violations of section 331 of this Title . . . ." 21 U.S.C. § 332 (a).[1]

---

1. This injunctive remedy is one of three enforcement tools of the Food and Drug Administration ("FDA") under the Act, the others being criminal prosecution with fine or imprisonment as the penalties, 21 U.S.C. § 333, and seizure of goods shipped in violation of the Act with forfeiture and either destruction, relabeling, reconditioning, or sale as the sanction. 21 U.S.C. § 334.

A comprehensive study of the FDCA, published in 1954, concluded that seizure was the "basic judicial sanction of the FDA," comprising 85% of the court enforcement proceedings. The same research found that

A careful review of the FDCA in its entirety reveals that this is the sole authorization for equitable relief.[2] And it is clear that nowhere in section 302(a) is recall specifically mentioned. See Clevenger, Recalls, 27 Food, Drug Cosm.L.J. 332 (1972); Cody, Food Recalls, 27 Food, Drug Cosm.L.J. 336 (1972); Lambert, Voluntary Recalls or Delegated Seizures: The Legal Considerations, 27 Food, Drug Cosm.L.J. 668 (1972). The section appears to contemplate only negative injunctions prohibiting statutory violations, rather than any sort of mandatory or affirmative relief. See Note, Restitution in Food and Drug Enforcement, 4 Stan.L.Rev. 519, 521 (1952). Indeed, one close student of the Act has concluded that "[a]n injunction [under the FDCA] should forbid only the acts which are prohibited by the statute." Toulmin, The Law of Foods, Drugs and Cosmetics § 7.4, at 100 (1963). Thus, no explicit statutory authorization for either administrative or judicial recalls exists. H.R.Rep.No.585, 92d Cong., 1st Sess. 3 (1971).

The legislative history of the Act apparently contains no reference to the recall remedy. Indeed, the legislative background is of relatively minimal assistance in determining congressional intent with respect to the injunctive provision at all; section 302 caused little discussion. See H.R.Rep.No.2716, 75th Cong., 3d Sess. 22 (1938); H.R. Rep.No.2139, 75th Cong., 3d Sess. 3–4 (1938); S.Rep.No.361, 74th Cong., 1st Sess. 30 (1935); Note, Restitution in Food and Drug Enforcement, 4 Stan.L. Rev. 519, 521 and n. 17 (1952).

Initially, it is noteworthy that the Federal Food and Drugs Act of 1906[3] contained no injunctive provision. The basic judicial and administrative procedures for enforcement of the 1906 Act's prohibitions were four-fold: (1) criminal proceedings, (2) libel for condemnation proceedings, and (3) administrative exclusion of imports, and (4) administrative inspection proceedings concerning seafoods. See Lee, The Enforcement Provisions of the Food, Drug and Cosmetic Act, 6 Law & Contemp.Prob. 70 (1939). Thus, there existed no injunctive precedent which Congress could be deemed to have approved in section 302(a) or which could have guided Congress in shaping that provision.

Secondly, the scant legislative history which does exist suggests, if anything, that Congress was concerned with the harshness of the remedies upon manufacturers. The objectives sought by Congress in providing for the new injunctive procedure, and congressional regard for injunctions in the enforcement matrix, are perhaps best indicated by the following excerpt from the report of the House of Representatives:

"This procedure will be particularly advantageous in border-line cases that cannot be settled without litigation. In many such cases it is unfair to the manufacturer to subject him to criminal trial and likewise unfair to the public to have the issue determined under the restrictions necessarily prevailing in criminal procedure. This remedy should reduce litigation. In some cases it should avoid the hard-

---

injunctive provision, on the other hand, was invoked in less than one percent of the cases brought under the Act. Note, Developments in the Law—The Federal Food, Drug and Cosmetic Act, 67 Harv.L.Rev. 632, 683, 701, 714 (1954). See Note, Restitution in Food and Drug Enforcement, 4 Stan.L.Rev. 519 n. 7 (1952).

It also appears from the literature that, more recently, an FDA program of voluntary recall, to be discussed later in the text, has been increasingly relied upon by the agency. See generally Clevenger, Recalls, 27 Food, Drug Cosm.L.J. 332 (1972); Kasperson,

Food, Drug and Cosmetic Law Section Recall Panel, 27 Food, Drug Cosm.L.J. 349, 350 (1972).

2. It has been argued that Congress probably considered section 302(a) to be the only authorization for equitable relief under the Act. Note, Developments, *supra* note 1, at 719–20.

3. 34 Stat. 768 (1906), as amended, 37 Stat. 416 (1912), as amended 37 Stat. 732 (1913), 41 Stat. 712 (1919), as amended, 46 Stat. 1019 (1930), as amended, 48 Stat. 1204 (1934), as amended, 49 Stat. 871.

ship and expense to litigants in seizure cases. In many instances seizure is a harsh remedy and should be discouraged or confined to those cases where the public protection requires such action. In many cases, it is believed . . . injunctions can be used with equal effectiveness and with less hardship. A seizure case finally decided in favor of a defendant leaves him without recourse for his losses, including court costs, storage, and other charges." Lee, Enforcement Provisions, *supra* at 85, *quoting,* H.R. Rep.No.2139, 75th Cong., 3d Sess. 3–4 (1938).

This passage strongly suggests that the House, at least, considered seizure to be the most severe remedy and that injunctive proceedings were viewed as a means to alleviate the hardships seizures might cause to manufacturers. Given this orientation, and the potential difficulties concomitant to a recall, see generally Thomas, Production Records: Tracing and Recording of Ingredients, 27 Food, Drug Cosm.L.J. 680 (1972); Livingston, The Removal and Disposal of Suspect Product, 27 Food, Drug Cosm.L.J. 702 (1972); Khan & Healton, Recall of Food Products: Emergency Standby Procedures at the Home Office, 27 Food, Drug Cosm.L.J. 702 (1972), it is difficult to conclude that Congress intended section 302(a) to authorize judicial recalls.

Despite this congressional silence, recalls have played an increasingly significant role in the FDA's enforcement of the Act. Approximately 18 years ago, the agency initiated procedures for the voluntary recall of violative products, as an alternative to seizures, prosecution, and injunctive actions. H.R.Rep.No.585, 92d Cong., 1st Sess. 3 (1971). In March, 1971, a subcommittee of the House of Representatives Committee on Government Operations held a hearing on these recall practices. Hearing on Recall Procedures of the Food and Drug Administration Before a Subcomm. of the House Comm. on Gov't Operations, 92d Cong., 1st Sess. (1971). Questioning of senior FDA officials made clear that neither the members of the subcommittee nor the FDA considered the Act to authorize judicial or administrative recalls. The following exchange between Representative Goldhammer and Mr. James Grant, FDA Deputy Commissioner of Foods and Drugs, is instructive on this point:

"Mr. Goldhammer: There is no provision in the Food, Drug, and Cosmetic Act for a recall as an administrative *or judicial proceeding,* is that right?

"Mr. Grant: Correct." Hearing, *supra,* at 5 (emphasis added).

Mr. William Goodrich, FDA General Counsel, also made it clear that his agency considered the program to be strictly voluntary in his testimony:

"The entire thing [the recall program], though is in a sense voluntary. By that I mean *there is nothing in the law that expressly authorizes the recall procedure,* that is an alternative to our recommending seizures to the U. S. attorney." *Id.* at 10 (emphasis added). See also *id.* at 31; GAO, Report to Congress, Lack of Authority Limits Consumer Protection: Problems in Identifying and Removing from the Market Products which Violate the Law (1972); Cody, Food Recalls, 27 Food, Drug Cosm.L.J. 336, 338 (1972).

The report growing out of this investigation concluded that "no statutory authorization for recalls exists," H.R.Rep. No.585, 92d Cong., 1st Sess. 3 (1971), and that the "FDA cannot legally enforce its requests or demands for recall action." *Id.* at 4.[4]

---

4. The congressional subcommittee recommended that the FDA undertake a study to determine the desirability of amending the Act to provide for recall of violative products, and, if such action were found meritorious, to submit draft legislation. H.R.Rep. No.585, 92d Cong., 1st Sess. 20 (1971). Although this court's attention has not been called to any FDA study or proposal on this topic, it appears that a bill providing for re-

The government contends that these materials address only the issue of administratively-ordered recalls. Granting that the congressional investigation may have been limited to that topic, the court cannot overlook the reference to judicial recalls in the colloquy between Representative Goldhammer and Mr. Grant. Furthermore, if any of the members of the subcommittee or any of those testifying on behalf of the FDA were of the opinion that statutory authority for judicial recalls existed, it is surprising that this view was not expressed at some point during the hearing or in the report.

Only two cases have been discovered in the official reporters wherein recall was judicially sanctioned in litigation arising under section 302(a). In neither instance, however, did the court address the question at issue here. In United States v. Lanpar Co., 293 F. Supp. 147 (N.D.Texas 1968), the court merely entered findings of fact and conclusions of law and ordered the defendant drug company to recall and destroy certain reports, bulletins, and leaflets, and drugs containing combinations of digitalis and thyroid. *Id.* at 155. The second case, United States v. Lit Drug Co., 333 F.Supp. 990 (D.N.J.1971), had been preceded by a history of 15 voluntary recalls of adulterated drugs by defendants. *Id.* at 995. Significantly, the court expressly noted that "[d]efendants do not quarrel with the government demand for a recall of drugs . . . ." *Id.* at 999.[5]

In a somewhat analogous case to this one, United States v. Parkinson, 135 F. Supp. 208 (S.D.Cal.1955), aff'd, 240 F. 2d 918 (9th Cir. 1956), heavily relied upon by defendant, the court determined that it lacked authority under section 302(a) to order the manufacturer of an adulterated product to make *restitution* to the purchasers of the product.[6] Both parties seem to agree that "restitution" and "recall" are different labels for essentially the same result. In *Parkinson*, the trial judge began his analysis

"with the axiomatic premise that the district court is one of limited jurisdiction, and has only the power and the jurisdiction spelled out in the statutory enactments of Congress. We exclude from consideration the equity power of the court called into play in a diversity suit, and also exclude those situations in which, by statute, the Congress has expressly provided that the court may exercise all the powers of a court of equity." United States v. Parkinson, *supra*, 135 F.Supp. at 210.

The government's analogies to cases under the Emergency Price Control Act, the Fair Labor Standards Act, and the Sherman Act were rejected. *Id.* at 210–212. In conclusion, the court noted that restitution, in stark contrast to the traditional preventive character of injunctive relief, was essentially punitive in nature, and found nothing in the legislative history of the FDCA to support any sanction other than criminal prosecution, seizure, and traditional negative injunctions. *Id.* at 212–213.

Here, the government questions the continuing validity of *Parkinson* in light of the well-accepted proposition that a federal court, unless restricted by statute, may exercise the full range of equitable powers in support of its jurisdiction and in order to do complete justice in a particular case. Accordingly, plaintiff argues that, for this court "to do justice completely, and not by halves," Camp v. Boyd, 229 U.S. 530,

---

call and ancillary authority recently was introduced in the House. See H.R. 14805, 93d Cong., 2 Sess. (1974).

5. Any subsequent indication in the opinion that the court deemed the recall procedure authorized by the Act is entitled to minimal if any, weight in light of defendants' failure to contest the issue.

6. In addition to seeking general injunctive relief, the complaint requested "that the defendants be ordered to tender to all present and past purchasers of the drugs enumerated . . . a refund of all amounts collected by said defendants from said purchasers." United States v. Parkinson, *supra*, 135 F.Supp. at 209.

551, 33 S.Ct. 785, 793, 57 L.Ed. 1317 (1913), a recall must be ordered.

Particular reliance is placed upon Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed. 2d 323 (1960). In that case, certain employees had been discriminatorily discharged for seeking the assistance of the Secretary of Labor in recovering wages allegedly unpaid in violation of the Fair Labor Standards Act of 1938 ("FLSA"). The Supreme Court ruled that, in an action by the government to restrain violations of the Act,[7] a district court had jurisdiction to order an employer to reimburse employees for wages lost because of unlawful discrimination or discharge. The proper criteria for determining the existence of authority to grant ancillary equitable relief was deemed by the Court in DeMario to have been stated earlier in Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946):

"Thus the Administrator invoked the jurisdiction of the District Court to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act. Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. . . . [T]he court may go beyond the matters immediately underlying its equitable jurisdiction . . . and give whatever other relief may be necessary under the circumstances. . . .

"Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' Brown v. Swann, 10 Pet. 497, 503 [9 L.Ed. 508]. . . ." 361 U.S. at 291, 80 S.Ct. at 334, quoting 328 U.S., at 397–398, 66 S.Ct. 1086.

It was clear to the Court in DeMario that, in seeking to achieve minimum labor standards under the FLSA, Congress had chosen to rely upon complaints and information forwarded by employees. As the Court noted, "effective enforcement could thus only be expected if employees felt free to approach officials with their grievances." 361 U.S. at 292, 80 S.Ct. at 335 (emphasis added).[8] Thus, the rationale for restitution was clear: To create the incentive for employees to seek statutory remedies by eliminating the Hobson's choice (1) of attempting to secure their lawful wages with the prospect of discharge and irretrievable wage loss for an indeterminate period, or (2) of foregoing their just wages secure in their employment. See id. at 292–293, 80 S.Ct. 332.

In Warner Holding Co., also relied on by the Government, it was determined that a federal court had authority in an enforcement proceeding under the Emergency Price Control Act of 1942 to order restitution of rents collected by a landlord in excess of prescribed maximums. The injunction provision of that

---

7. Similar to the statutory language involved here, the FLSA gave federal district courts jurisdiction "for cause shown, to restrain violations of" that section of the statute prohibiting discrimination against employees for instituting proceedings under the Act. See 361 U.S. at 289, 80 S.Ct. at 334.

8. "[F]ear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions." Id.

statute, however, conferred authority upon the court to enforce compliance by granting "a permanent or temporary injunction, restraining order, *or other order* . . . ." See 328 U.S. at 397, 66 S.Ct. at 1089 (emphasis added). The Court went on to state:

> "As recognized in Hecht Co. v. Bowles, supra, 321 U.S. [321,] 328, 64 S.Ct. [587] 591, [88 L.Ed. 754] (1944)], *the term 'other order' contemplates a remedy other than that of an injunction or restraining order,* a remedy entered in the exercise of the District Court's equitable discretion." *Id.* at 399, 66 S.Ct. at 1089 (emphasis added).[9]

The legislative history of the injunctive provision made clear that the courts were authorized "to issue *whatever order* to enforce compliance is proper in the circumstances." 328 U.S. at 401, 66 S.Ct. at 1090 *quoting,* S.Rep.No.931, 77th Cong., 2d Sess. 10 (1942). No provision of the Emergency Price Control Act was deemed to preclude, either expressly or impliedly, a court from ordering restitution. Neither did the Court view the statute as providing special and exclusive remedies, thereby negating any other jurisdiction. See 328 U.S. at 403, 66 S.Ct. 1086. Furthermore, in *DeMario*, restitution was considered appropriate and necessary to enforce compliance with the Act in question. See *id.* at 400, 66 S.Ct. 1086.

■ Thus, in both *DeMario* and *Warner Holding Co.,* the statutory interpretation adopted by the Court was consistent with the statutory language and policy, and the legislative history, and necessary to effective enforcement of the laws in question. Both decisions recognized, however, that a statute may expressly or "by necessary and inescapable inference" restrict a court's equitable jurisdiction. 361 U.S. at 291, 80 S.Ct.

332; 328 U.S. at 397, 66 S.Ct. 1086. Under those standards, this court has determined that its inherent equitable jurisdiction is not available to support the issuance of a recall order.

It is clear that the FDCA establishes a specific, threefold enforcement scheme of injunctions, seizure, and criminal prosecutions. This system provides adequate before and after the fact remedies. Injunctive suits are appropriate for preventive relief, and criminal and seizure proceedings are available after the allegedly offending article has begun movement in interstate commerce. In seeking this recall, the government is asking for judicial sanction of an additional arrow for its already well-equipped bow. Although the institution of multiple seizure actions may be more burdensome than a single recall to the government, that alternative remains as a valid and frequently-used enforcement tool.[10] Moreover, after studying the FDA's voluntary recall program, the aforementioned House subcommittee indicated its view on the efficacy of seizure by its statement that "the statute appears to provide *adequate authority to clear the market* of potentially dangerous or fraudulent products by seizure alone . . . ." H.R.Rep.No.585, 92d Cong., 1st Sess. 3 (1971) (emphasis added).

No Hobson's choice, comparable to that in *DeMario,* is involved in the FDCA procedures. Congress may have considered the probability that the adulterated nature of a cosmetic may not become known until after its distribution in interstate commerce and its use by consumers, as appears to have been the case with "Long Nails". Furthermore, where the public danger is clear, the literature indicates that manufacturers are willing to institute their own recalls or to cooperate with the FDA in a recall effort. See Cody, Food Recalls, 27

---

9. In a later case, the Court asserted that the "other order" phrase was the basis of the *Warner Holding Co.* decision. United States v. Moore, 340 U.S. 616, 619, 71 S.Ct. 524, 95 L.Ed. 582 (1951).

10. The court is informed that there have been four seizures of "Long Nails" to date throughout the country. See also note 1 *supra.*

Food, Drug Cosm.L.J. 336 (1972); Kasperson, Food, Drug and Cosmetic Law Section Recall Panel, 27 Food, Drug Cosm.L.J. 349 (1972); Lambert, Voluntary Recalls or Delegated Seizures: The Legal Considerations, 27 Food, Drug Cosm.L.J. 668 (1972).

■ Thus, this court cannot conclude that "effective enforcement [of the Act] could . . . only be expected," Mitchell v. Robert DeMario Jewelry, Inc., *supra* at 292, 80 S.Ct. at 335, by interpreting section 302(a), or the statute in general and the circumstances surrounding its enactment, to allow the court to exercise its equitable powers to order a recall of adulterated products already on the market. This court is convinced that such an interpretation would constitute an unjustifiable judicial amendment of the FDCA. A review of the legislative history and statutory scheme can only lead to the conclusion that it was not the congressional purpose in the FDCA to empower courts to issue injunctions beyond prohibiting the violations specifically referred to therein.

However, even assuming that the statutory language and policy and the legislative history supported a judicially-ordered recall under section 302(a) or inherent equitable jurisdiction, this court, in the exercise of its equitable discretion, would decline to enter such an order. A balancing of the parties' interests, plus due regard for the public welfare, does not support recall relief.

■ Although two hearings have been held in this matter, the case is still in a preliminary stage. A full trial on the merits remains for the future. With the case in this posture, a mandatory injunction should be issued only in exceptional circumstances. Iron City Indus. Cleaning Corp. v. Local 141, Laundry & D.C.I.U., 316 F.Supp. 1373, 1375 (W.D.Pa.1970).

■ Defendants have presented evidence to cast serious doubt upon the wisdom of ordering a recall. The uncontroverted testimony of the president of defendant C.E.B. Products, Inc., established that a recall would render the company insolvent and necessitate bankruptcy proceedings. Although it is highly doubtful whether any business has a constitutional right to remain in business, *cf.* City of Pittsburgh v. Alco Parking Corp., 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974), especially where it is found to be illegal, United States v. Ellis Research Lab., Inc., 300 F.2d 550 (7th Cir.), cert. denied, 370 U.S. 918, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962), courts are properly reluctant to issue orders at the preliminary stage of litigation where the effect may be to eliminate the party as a competitive economic unit. See *e. g.*, United States v. G. Heileman Brewing Co., 345 F.Supp. 117, 121–123 (E.D.Mich.1972). As Congressman Fountain remarked during the 1971 hearing, "[w]e are interested in protecting the consuming public but we are likewise interested in manufacturers—they have to survive." *Hearing, supra* at 31.

If a recall were ordered and if C.E.B. Products were to survive until a final hearing, defendants' costs of reimbursing distributors and of storage, and other hardships, might render an ultimate determination in their favor a somewhat pyrrhic victory.

The injuries suffered by consumers, upon which proof was presented—nails splitting and falling off, redness, soreness, nail disfigurement, and infection —albeit serious and uncomfortable, are not of that severity and proportion to warrant the extraordinary remedy sought by the Government. It appears in most cases that the harm can be treated.

■ Thus, even assuming that recall is an available alternative remedy, a careful consideration of the public and private interests in this case dictates that a recall not be ordered.

Accordingly, the Government's prayer that this court order defendants to recall the cosmetic in question is hereby denied.