240 F.2d 918
 UNITED STATES of America, Appellant,
v.
Wayne A. PARKINSON, an Individual Trading and Doing Business
as Glandular Products and Dybutol Company, and Allen H.
Parkinson, and Individual Trading and Doing Business as Tide
Mailing Service, and Margaret M. Willis, Appellees.
 No. 15032.
 United States Court of Appeals Ninth Circuit.
 Nov. 21, 1956.
 
 Laughlin E. Waters, U.S. Atty., Max F. Deutz, Asst. U.S. Atty., Arthur A. Dickerman, Attorney, Department of Health, Education & Welfare, Los Angeles, Cal., for appellant.
 Daniels, Elson & Mathews, Los Angeles, Cal., for appellees.
 Before FEE, BARNES and HAMLEY, Circuit Judges.
 JAMES ALGER FEE, Circuit Judge.
 
 
 1
 This cause was brought at the instance of Food and Drug Administration, Department of Health, Education and Welfare, in the name of the United States of America against the individuals named as defendants, praying that these latter be restrained from introducing into interstate commerce certain misbranded drugs and requiring defendants to make restitution to purchasers thereof, present and past. The claimed misbranding related to relief from male sexual weakness and impotence and to rapid sexual rejuvenation. A temporary restraining order was granted by the trial court and later extended. Subsequently, after the grant of preliminary injunction, there was entered a judgment by which defendants were permanently enjoined and restrained from doing acts in violation of § 301(a) of the Federal Food, Drug, and Cosmetic Act[1] with respect to all these drugs enumerated, 'or other similar drugs, or other drugs offered for similar purposes.' This portion of the judgment was entered by consent. There was also submitted to the court by stipulation the question whether restitution could be required. The trial court, pursuant to stipulation, divided this into two questions: (1) whether the court had power under the statute to order restitution; and (2) whether restitution would be ordered in this particular case.
 
 
 2
 It is difficult indeed to see how any relief could be granted in this case. The supposition is that there were purchasers because there were allegations in the complaint of sales in interstate commerce. But no purchaser was named as a party to the action. The United States did not sue as a representative of any purchaser. There is a suggestion in the prayer only that relief be granted by way of restitution. The body of the complaint contains no allegations upon which the suggestion could be supported. There was no evidence introduced either as to identity of purchasers or as to the amount of drugs unlawfully sold. No judgment could be entered for such refunds, if found in favor of the purchasers themselves, because none was a party to the proceeding. No judgment could be entered in their behalf in favor of the United States or the agency. But, besides such technical matters, it was demonstrated that the District Court had no jurisdiction to give such relief under the statute.
 
 
 3
 In a sound and able opinion, Hon. James M. Carter, United States District Judge, analyzed the problem, reviewed the statutes and determined that the particular enactment did not confer jurisdiction upon the United States District Courts to make such an order.[2] With this opinion we agree, and the conclusions thereof we affirm. The jurisdiction of the District Court must be found in the language and implications of the particular statute.
 
 
 4
 It is agreed that the history and language of the laws for control of monopolization properly permit the application by the courts of orders requiring divestiture of properties of an existing monopolist in order to prevent the continuance of the evil.[3] But the statute[4] under which such relief was granted was much broader in scope than the legislation under consideration, and further divestiture requires only that defendant sell the offending properties at a price, while in the instant case it is sought to force defendant, who has received a price for property which he sold on a free market, to refund such money to be held for a purchaser who paid it willingly. The courts construed certain language of the Price Control Act[5] to compel mandatory restitution.[6] But this legislation was passed and interpreted in time of a struggle for national existence. These laws are now in abeyance and they constitute a doubtful precedent for the extension of enactments such as this which are intended to represent permanent policy in peaceful times as well. These wartime regulations were tremendously unpopular and were deemed arbitrary and oppressive when they were relegated to limbo.[7] An attempt by the Administrator of the Wage and Hour Division to assert the power of collecting restitution was supported by various courts improvidently.[8] The Congress rebuked this attempt and in effect repealed the supporting decisions by amending the basic act expressly to forbid collection of restitution by the agency.[9] Since the Fair Labor Standards Act and the Food, Drug and Cosmetic Act were passed at the same time,[10] an attempt to extend provisions of the latter statute might be similarly rebuked.[11] This feature would not prevent a like construction if the language intendment and history of enforcement thereof convinced us it was a pleadable position. But a diametrically opposite conclusion is forced upon us by these factors.
 
 
 5
 The Congress granted three specific powers by this Act. The first was the power to bring criminal prosecutions for violations.[12] The second permitted seizure of drugs proscribed in interstate commerce.[13] The third empowered the courts to restrain violations.[14] Ordinarily, grant of such specific powers would be indicia of the denial of more extensive authority.
 
 
 6
 On account of the importance of the subject, it is necessary to deal with certain arguments made upon appeal.
 
 
 7
 There is insistently urged upon us the beneficent purposes of the agency, the necessity of protection of the public and the evils of exploitation of the unwary by fraudulent claims as to drugs the use of which may be harmful. Of course, these elements were the factors which motivated the enactment of the statute. Those who drafted the law and secured passage thereof were fully cognizant of the evils at which it was aimed. Unquestionably, there was a subsidiary purpose to protect the purses of the public and to prevent the vending of alleged remedies, which at best were useless, to fatten the pockets of the exploiter. The agents of the government bring forcibly to our attention our own opinion[15] where the court rightly recognized the harm of permitting the introduction into commerce of drugs of this type. They further emphasize the persistence of the individual defendants here, notwithstanding criminal convictions, decrees of restraint and seizure of drugs, in finding new drugs to exploit by false advertising in order to reap a golden harvest for a short time.
 
 
 8
 But advertisements of nostrums for restoration of 'Lost Manhood' have appeared in the daily newspapers for at least fifty years in the past. The drafters of the bill and those who engineered its adoption were cognizant of the persistence of those who desired to make money by such means.
 
 
 9
 The record of the past few decades is replete with examples of the tendency of executive agencies to expand their field of operations. A passion and a zeal to crusade affects their operations. Strong public opinion may temporarily encourage excesses in zeal. The enforcement of certain measures based upon worthy causes may induce violent reactions. Examples may be found in the enforcement of laws for prohibition of intoxicants and for the rationing of goods in war. These are warning signs that zeal for the noblest causes should not be translated into uncontrolled power of suppression of the contraries. The courts are charged with the duty of compelling restraint.
 
 
 10
 It is particularly urged upon us that a court of equity has power to fashion remedies to meet situations and to compel compliance with decrees. To a certain extent this is correct in litigation between private individuals. But Chancery has ceased for long ages to issue new writs whereby supposed wrongs could be cured. Such objectives are modernly to be accomplished only by legislation. Hundreds of years ago, likewise, equity ceased to be the measure of the 'King's foot.' In litigation between private individuals, the course and remedies of equity became standardized, as these had at common law. The growth of precedent delayed improvident and ad lib expansion.
 
 
 11
 Equity had, however, developed a great many devices for enforcement of its decrees. But it was with great reluctance that a mandatory decree was entered even in private litigation. Payment of money held in trust might be required. At times, incidental damages were allowed. Penalties were abominated.
 
 
 12
 It was not the fashion of the English Crown to use the Chancery as a method of enforcement of regulations and executive orders. Therefore, the precedents in compulsion to accomplish governmental decretals are found rather in the Court of the Star Chamber, of unhappy memory. The case of the Bishops seems to have forecast an end to this development. In our time, through necessity, cases based upon violations of administrative rules and regulations have been brought in courts which have the traditional equity powers and remedies between individuals.
 
 
 13
 When Congress authorizes the enforcement by an administrative body, of rules, regulations or orders promulgated by it, the history of equity and the Court of the Star Chamber in this type of litigation should not be forgotten. The use of the extraordinary remedies of equity in governmental litigation should never be permitted by the courts unless clearly authorized by the statute in express terms. Anything which savors of a penalty should not be permitted unless Congress has expressly so provided, since the spirit of equity abhorred such punitive measures. Here it is apparently contemplated that a judgment be entered in favor of the United States for a definite sum of money for 'restitution.' If the agency were unable or did not give the moneys to the purchasers, it would be covered into the Treasury of the United States.
 
 
 14
 The collection of moneys not held in trust or earmarked from an individual by an executive department without limitation in amount and without detailed means outlined for disbursement to persons supposed to have paid them constitutes a penalty for violation of a regulation. Indeed, it is with great difficulty, as suggested above, that either the remedy or the word 'restitution' can be twisted or tortured to cover the relief which the agency seeks in this case.
 
 
 15
 The holding of the Court is that neither the statute nor any other legislation gives the District Court jurisdiction to grant the relief sought. The equitable powers of the court can not be invoked in the situation because of lack of statutory authority, express or implied.
 
 
 16
 We have construed the consent judgment granting injunction and the separate judgment denying so-called 'restitution' as one instrument. The appeal was taken only from the latter part.
 
 
 17
 Appeal dismissed.
 
 
 
 [1]
 21 U.S.C.A. § 331(a)
 
 
 [2]
 United States v. Parkinson, 135 F.Supp. 208
 
 
 [3]
 See Sherman Act of 1890, § 4, 26 Stat. 209, as amended 15 U.S.C.A. § 4, as construed by Schine Chain Theatres, Inc., v. United States, 334 U.S. 110, 126-130, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Paramount Pictures, 334 U.S. 131, 170-174, 68 S.Ct. 915, 92 L.Ed. 1260
 
 
 [4]
 15 U.S.C.A. § 4 permits the government 'to institute proceedings in equity to prevent and restrain such violations,' while the Food, Drug, and Cosmetic Act, § 302, 21 U.S.C.A. 332, grants to the District Court only 'jurisdiction, for cause shown * * * to restrain violations of section 331,' § 301 of the Act. (Emphasis added.)
 
 
 [5]
 Emergency Price Control Act of 1942, § 205(a), 56 Stat. 23, 33, 50 U.S.C.A.Appendix, § 925(a), empowering the court to grant upon a proper showing 'a permanent or temporary injunction, restraining order, or other order,' without bond. (Emphasis added.)
 
 
 [6]
 See Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332, construing the statutory language 'other order' to include the remedy of restitution
 
 
 [7]
 A similar result obtains under a similar Act in United States v. Moore, 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582, construing § 206(b) of the Housing and Rent Act of 1947, as amended, 61 Stat. 199, 50 U.S.C.A.Appendix, § 1896(b). However, this Act, like Price Control, was born of wartime stress. It also provides for local termination upon the expression of such a desire by municipalities by resolution made after hearings. § 204(j)(3), 50 U.S.C.A.Appendix, § 1894(j)(3). A similar choice may be made at the state level. § 204(j)(1, 2), 50 U.S.C.A.Appendix, § 1894(j)(1, 2). The former election has already been made in Dallas, Texas. United States v. Moore, supra
 
 
 [8]
 See, for example, McComb v. Frank Scerbo & Sons, 2 Cir., 177 F.2d 137; Walling v. O'Grady, 2 Cir., 146 F.2d 422
 
 
 [9]
 The Fair Labor Standards Act of 1938, § 17, 52 Stat. 1069, 29 U.S.C.A. § 217, was amended by the Act of October 26, 1949, 63 Stat. 919, and now reads in pertinent part: 'Provided, that no court shall have jurisdiction, in any action brought by the Secretary of Labor to restrain such violations (of 29 U.S.C.A. § 215, entitled in part 'prohibited acts'), to order the payment to employees of unpaid minimum wages or unpaid overtime compensation or an additional equal amount as liquidated damages in such action.' At the same time, a specific statutory remedy was created, enabling the Secretary of Labor to recover such amounts in any court of competent jurisdiction on behalf of employees to whom such wages were due. Fair Labor Standards Act of 1938, § 16(c), 29 U.S.C.A. § 216(c), as amended by the Act of October 26, 1949, 63 Stat. 919. The authority so conferred was under the most carefully outlined conditions and limitations, which do not exist if this power be conferred by implication from the language of the Food, Drug, and Cosmetic Act
 
 
 [10]
 The Fair Labor Standards Act of 1938, 52 Stat. 1060, et seq., 29 U.S.C.A. § 201 et seq., and the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040 et seq., 21 sU.S.C.A. 301, et seq., were both passed on June 25, 1938
 
 
 [11]
 Especially since § 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 217, before the 1949 amendment, and § 302(a) of the Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 332(a) are substantially identical
 
 
 [12]
 § 303, 52 Stat. 1043, as amended, 21 U.S.C.A. § 333
 
 
 [13]
 § 304, 52 Stat. 1044, as amended, 21 U.S.C.A. § 334
 
 
 [14]
 § 302(a), 52 Stat. 1043, 21 U.S.C.A. § 332(a)
 
 
 [15]
 United States v. El-O-Pathic Pharmacy, 9 Cir., 192 F.2d 62, 75