**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**UNIVERSAL MANAGEMENT SER-VICES, INC., CORPORATION; Natural Choice, Inc. Corporation, doing business as Natural Choice Products, Inc.; Paul M. Monea, individual; Paul A. Monea, Defendants–Appellants.**

No. 98–3310.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 10, 1999.

Decided Sept. 13, 1999.

Cassandra P. McGurk (briefed), Office of General Counsel, Food & Drug Administration, Rockville, MD, Alexander A. Rokakis, Asst. U.S. Atty. (briefed), Office of U.S. Attorney, Cleveland, OH, Deborah M. Autor (argued and briefed), U.S. Department of Justice, Civil Division, Office of Consumer Litigation, Washington, DC, for Plaintiff–Appellee.

Michael S. Pasano (argued and briefed), Christopher S. Carver, Zuckerman, Spaeder, Taylor & Evans, Miami, FL, for Defendants–Appellants.

Before: NORRIS and SUHRHEINRICH, Circuit Judges; RICE, District Judge.*

SUHRHEINRICH, Circuit Judge.

Defendants appeal summary judgment for plaintiff and a permanent injunction from the manufacture and sale of a device intended to relieve certain types of physical pain when applied to acupressure points. We **AFFIRM.**

The court of appeals reviews an order granting summary judgment de novo, and hence uses the same test as used in the district court. *See Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174, 178 (6th Cir.1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## I.

Appellants Universal Management Services, Inc., and Natural Choice, Inc. are Ohio corporations which are managed by

* The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

Appellants Paul M. Monea and his son, Paul A. Monea. As part of their business, Appellants sell and distribute a product known as the Stimulator, and also a product that connects to the Stimulator known as the Xtender. The Stimulator is essentially an electric gas grill igniter, marketed as a pain relieving device. To produce the Stimulator, Appellants purchase gas grill igniters and outfit them with finger grips. A user then places the tip of the Stimulator on his body, presses with his thumb on a plunger, and an electric current passes into that part of the body. Appellants' advertising literature states that, when applied to certain acupressure points, the Stimulator can relieve numerous kinds of pain (e.g., migraine headaches, swollen joints, allergies). J.A. at 76–77, 505, 808, 810, 814. The Xtender is an accessory that allows an individual to use the Stimulator to reach areas of the body otherwise difficult to reach, such as the spine. In total, Appellants sold a total of 800,000 gas grill ignitors, at a cost to the company of one dollar each, for $88.30 each. J.A. at 505, 793, 839.

In May 1995, U.S. Marshals seized over $1.2 million worth of Appellants' devices pursuant to seizure authority under the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 301 et seq. (FDCA). J.A. at 782–84. Later that month, the Food and Drug Administration (FDA) informed Appellants that they considered the devices adulterated and subject to regulation, threatening further legal action if approval was not sought and distribution did not cease. J.A. at 78. Distribution did not cease and the Government sought the injunction that is the subject of this appeal. The district court granted summary judgment for the Government on December 30, 1997, and, in February 1998, rejected Appellants' Motion for Reconsideration. J.A. at 774–75. The resulting judgment placed a permanent injunction against the distribution of Appellants' products and ordered Appellants to offer full refunds to all customers who had purchased their devices after the May 1995 seizure. J.A. at 39, 50.

## II.

The district court concluded that the Stimulator and Xtender are "adulterated" devices under the FDCA. Specifically, the Government claims that Appellants violated 21 U.S.C. § 331(a) and § 331(k), which prohibit misbranding or adulterating medical devices and introducing such devices into interstate commerce.

To show a violation of §§ 331(a) and (k), the Government must prove: (1) Appellants' products are "devices" within the meaning of the FDCA; (2) the devices are adulterated or misbranded; and (3) the devices move in interstate commerce. The third element is undisputed.

A device is "adulterated" under the FDCA if it is required to receive premarket approval ("PMA") from the FDA but moves in commerce even though it did not receive this PMA. See 21 U.S.C. § 351(f)(1)(B); United States v. An Article of Device Consisting of 1,217 Cardboard Boxes, 607 F.Supp. 990, 998 (W.D.Mich. 1985). Whether a device is required to receive a PMA from the FDA depends on a scheme set out in 21 U.S.C. § 360c. Under this scheme, all medical devices are categorized as Class I (minimal regulation), Class II (intermediate regulation), or Class III (stringent regulation) devices. All "new devices," those not on the market before 1976, are, as a default, automatically Class III devices.

Class III devices cannot be marketed unless either: (1) the manufacturer has submitted to the FDA an application for a PMA and receives approval; or (2) the manufacturer submits a "premarket notification" arguing that its device should be reclassified as Class I or II because it is substantially equivalent to an existing device so categorized and the FDA finds the devices are in fact so equivalent.

Appellants contend that their products[1] are not violative of §§ 331(a) & (k) for three reasons. First, they argue their products are not devices within the meaning of the FDCA. The FDCA's definition of "device" is as follows:

> The term "device" ... means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part or accessory, which is ...
>
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
>
> (3) intending to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purpose through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

21 U.S.C. § 321(h).

■ Appellants claim that their products are not devices because they (1) achieve their primary intended purpose through chemical action and (2) do not have any effect on the structure or function of the body. As the district court found, however, Appellants presented no genuine issue of material fact that their products operate through chemical action, and two of their own witnesses, Dr. Roy Bugay and Dr. Robert Charm, both indicated that their products do not operate through chemical action. J.A. at 34. The district court also noted that Appellants pointed to nowhere in the record to establish that their products have no effect on the structure or function of the body.[2]

■ We agree with the district court. Appellants' own description of the products supports the Government's position. Appellants describe the Stimulator, for example, as working as follows: "the [ ] electrical stimuli [from the device] ... stimulate excitatory cells which release electrical potentials which set off a chain of ... reactions that send messages to the brain creating a responsive reaction that organizes peptides to return the body to homeostasis." J.A. at 34. Appellants also assert their product relieves pain. As such, the products are intended to affect the function of the body and are, therefore, devices under 21 U.S.C. § 321(h)(3).[3]

---

1. Both parties focus their analysis on the Stimulator when debating coverage under the FDCA's definition of a device. Appellants fail to present this court with a distinction between the XTender and the Stimulator. The argument might be made that the XTender is merely an accessory to the Stimulator, sold separately, and does not independently satisfy the definition of "device." This court, however, will not speculate as to the factual or legal basis for such a claim. Because Appellants speak of their product as a singular entity, failing to distinguish between their functions or coverage under the FDCA, this court must treat them as such. *See United States v. Maliszewski*, 161 F.3d 992, 1015 (1998) (issue not raised in the district court or briefed to Court of Appeals could not be considered on appeal).

2. Moreover, if Appellants are correct that the Stimulator operates through chemical action, it would likely be subject to regulation as a drug or drug delivery device under the FDCA. *See, e.g.,* 21 U.S.C. §§ 321(a), 355(a), 352(*o*).

3. Alternatively, Appellants asserted below that their device is similar to a device marketed before 1976, thereby obviating the need for PMA. The district court concluded, however, that Appellants made only a conclusory claim to support this and pointed to no specific record evidence in support.

Appellants also claim that their product is not subject to a PMA because it is exempt from FDA approval. This argument is based on the contention that the Stimulator is identical to another device, the "Accu–Magic," which is considered a Class I device and is "listed" with the FDA as a therapeutic massage device—a class of products exempt from the premarket clearance requirement of the Medical Device Amendments to the FDCA. The device listing requirement, 21 U.S.C. § 360(j), is a means by which the FDA keeps a current inventory of devices marketed in the

## III.

In their Motion for Reconsideration, Appellants raised two issues not originally presented to the district court. First, Appellants claim that it was entitled to a new trial given the malfeasance of Appellants' original trial counsel. Second, Appellants claim that Paul A. Monea may not be personally subject to an injunction.

## A.

 The Notice of Appeal in this case, however, indicates that Appellants are appealing only from the district court's order granting summary judgment to the Government and the denial of their motion for summary judgment. Appellants fail to appeal from the district court's denial of their Motion for Reconsideration. J.A. at 55. Therefore, Appellants are foreclosed from asking this court to review the issues rejected in the district court's denial of their Motion for Reconsideration because the general rule is that "[i]f an appellant ... chooses to designate specific determinations in his notice of appeal—rather than simply appealing from the entire judgment—only the specified issues may be raised on appeal." *McLaurin v. Fischer*, 768 F.2d 98, 102 (6th Cir.1985). However, the Government addresses the merits of the Motion for Reconsideration issues raised on appeal because, it argues, absent a showing of prejudice, this court has usually considered such an error in what is appealed to be harmless. *See id.* This is inaccurate.

 The court must always consider its jurisdiction first and may not hear a cause over which it has no jurisdiction. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998). Federal Rule of Appellate Procedure 3(c)(1)(B) requires the designation of the judgment or order from which an appeal is taken. Moreover, this rule is jurisdictional and may not be "waived" by this court. *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Smith v. Barry*, 502 U.S. 244, 248, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992)("Rule 3's dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review.") (citing *Torres*, 487 U.S. at 316–17, 108 S.Ct. 2405). *Cf. Dillon v. United States*, 184 F.3d 556 (6th Cir.1999) (en banc) (although Rule 3 is jurisdictional in nature, mere errors in form will not always preclude jurisdiction). The Court in *Torres* cautioned, "although a court may construe the Rules liberally in determining whether they have been complied with, it may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met." *Torres*, 487 U.S. at 317, 108 S.Ct. 2405. *See also Maerki v. Wilson*, 128 F.3d 1005, 1007 (6th Cir.1997) ("The requirements of Rule 3(c) are jurisdictional in nature, and the court of appeals may not waive or diminish the rule's requirements."); *Minority Employees v. Tennessee Dep't of Employment Sec.*, 901 F.2d 1327 (6th Cir.1990) (en banc) (appellant's failure to satisfy the requirements of Rule 3(c) is fatal to his appeal); *Mattingly*, 153 F.3d at 337 (Rules 3 and 4 are jurisdictional and appellant's failure to

United States. The Government, however, presented a letter from the FDA to the manufacturer of Accu–Magic informing it that its device is not a therapeutic massager and that it is not exempt. J.A. at 36. Therefore, reference to Accu–Magic alone does not establish an exemption for the Stimulator. Moreover, as a Class III device, the FDCA requires a PMA or a finding by the FDA of substantial equivalence before a manufacturer may bring the product to market. See 21 U.S.C. § 360c(i); *United States v. One Unlabeled*

*Unit, THOR OF GENESIS*, 885 F.Supp. 1025, 1028 (N.D.Ohio 1995). Neither was obtained in this case.

Neither argument presented above is made on this appeal as a means of illustrating the FDA lacked authority to regulate Appellants' product. Each, however, is presented as evidence that Appellants' violation was minor and should not have warranted an order of restitution. That subject is discussed in Section V of this Memorandum.

sign the notice of appeal pursuant to Rule 4(a)(1) was fatal to the appeal).

"[L]itigants are charged with the responsibility for complying with the Federal Rules of Appellate Procedure." *Maerki,* 128 F.3d at 1008. We cannot excuse noncompliance. *Torres,* 487 U.S. at 317, 108 S.Ct. 2405. "Rather plainly, certain rules are deemed sufficiently critical in avoiding inconsistency, vagueness and an unnecessary multiplication of litigation to warrant strict obedience even though application of the rules may have harsh results in certain circumstances. Under *Torres,* Rule 3(c) is such a rule." *Minority Employees,* 901 F.2d at 1329. Because the notice of appeal references only the district court's summary judgment rulings, we do not have jurisdiction to consider issues raised in the Motion for Reconsideration.

## B.

■ In so far as we would be required to consider the merits of the issue of malfeasance of counsel as properly appealed, we find no reversible error. This court reviews the district court's denial of the Rule 60(b) motion for an abuse of discretion. *See Hood v. Hood,* 59 F.3d 40, 42 (6th Cir.1995).

■ Appellants argue that the district court erred in denying their Motion for Reconsideration because, they contend, the alleged wrongdoing of their former counsel, Edwin Davila, provides grounds under Federal Rule of Civil Procedure 60(b) for relieving them of the district court's summary judgment order against them. Rules 60(b)(1)-(5) provides relief for mistakes, inadvertence, excusable neglect and other similar situations. Rule 60(b)(6) is a catch-all provision that should be granted only when the movant demonstrates "extraordinary circumstances." *See Liljeberg v. Health Services Acquisition, Corp.,* 486 U.S. 847, 863–64, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).

The "malfeasance" that Appellants allege is essentially that Mr. Davila: (1) committed crimes (stole money, created a fictitious lawsuit, and stole a car); (2) refused to return files to them; (3) engaged in various misdeeds in the district court proceedings (copied from a law review article, a case, and a Federal Register notice; filed videotapes instead of written affidavits; failed to serve Government counsel; and taped a telephone conversation without the knowledge of all parties); and (4) inadequately represented them by making a frivolous argument, not conducting discovery, and failing to argue that an individual cannot be enjoined unless he was a "high managerial agent" who "knew that his actions violated the FDCA."

Davila ceased representing the Appellants in August, 1997, and a new attorney, Ralph Burns, took over their representation at that time. J.A. at 459. The district court formally admitted Burns to the case in September 1997. J.A. at 461. Appellants had the opportunity, through Burns, to bring these allegations of malfeasance to the district court's attention prior to final judgment. In fact, Burns moved successfully to reopen summary judgment on the issue of disgorgement in September 1997. J.A. at 470, 481. There is no evidence he would have been unable to similarly correct any other legal errors by Davila. Appellants began to discover the alleged malfeasance at least as early as August 1997, four months before the district court issued its summary judgment order. J.A. at 763. They filed their six complaints against Davila with the Ohio bar in October, two months before entry of summary judgment. J.A. at 832–934. In fact, prior to summary judgment, Burns chose to inform the district court of the substance of one of the complaints to the bar. J.A. at 487. He could have informed the district court of the remaining issues, allowing the district court an opportunity to give Appellants additional means for correcting any errors of Davila.

There is also no evidence that Appellants ever sought an order compelling Davila to return the missing files. Burns

could have sought a stay and could have himself sought the discovery of the materials Appellants claim Davila should have sought.[4] Burns was not without opportunity to seek these methods of relief or correction, for he interacted with and appeared before the district court on numerous occasions prior to entry of summary judgment. J.A. at 464, 462–63, 11, 493, 786. There was no reason to disrupt the finality of the district court's judgment when Appellants had an opportunity to overcome the errors of Davila.

Moreover, Appellants have failed to establish prejudice from the malfeasance. There is no evidence presented that the crimes alleged against Davila are relevant to the merits of this case. Appellants do not identify anything in the missing files that could change the case.[5] The misdeeds before the district court are also not tied to the district court's decision. Appellants did not lose based on any procedural errors but instead lost on the merits. They also fail to tie Davila's frivolous arguments to any prejudice. Finally, Appellants do not identify any issues on which further discovery could have led to evidence that could have affected the outcome of the case.

The issues in this case were fully briefed and decided on the merits by the district court.[6] Because Appellants had ample opportunity to cure the effects of the malfeasance prior to entry of summary judgment and, alternatively, because they cannot show any prejudice from the errors or misdeeds of counsel, the district court was not faced with any enumerated rationale under Rule 60(b) nor was it faced with

"extraordinary circumstances" justifying a disruption of the finality of the district court judgment. Therefore, it did not abuse its discretion by denying Appellants' Motion for Reconsideration.

### C.

In their Final Brief, Appellants argue that Paul A. Monea cannot be enjoined individually because he is not a covered individual for such liability under 21 U.S.C. § 335a(b). In their Reply Brief, Appellants contend that, even if § 335a(b) does not preclude enjoining Paul A. Monea, general principles of equitable injunctions prevent subjecting him to such action.

### 1.

■ Even assuming the issue of enjoining Paul A. Monea were properly noticed in the notice of appeal, Appellants face additional obstacles preventing this court from reaching the merits of that claim. The Government contends that Appellants' argument, that Paul A. Monea cannot be enjoined individually because he was not a "high managerial agent" with knowledge that he was violating the FDCA as required for such liability under 21 U.S.C. § 335a(b), was never presented to the district court and, therefore, cannot be considered by this court. *Bailey v. Floyd County Bd. Of Educ.*, 106 F.3d 135, 143 (6th Cir.1997). It is correct. Because the issue was not raised in the district court below, Appellants have waived their right to argue the point on appeal. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir.1990) ("This court will not

---

**4.** In fact, there is evidence Burns contemplated doing so but apparently decided against it. J.A. at 459.

**5.** Although they mention a study that they claim relates to substantial equivalence of the Stimulator to another device, "substantial equivalence" is a judgment for the FDA, not the courts, and therefore the absence of that study is not relevant to the courts' decisions.

**6.** The two cases primarily relied upon by Appellants, *United States v. Cirami*, 563 F.2d 26

(2d Cir.1977), and *Boughner v. Secretary of HEW*, 572 F.2d 976 (3d Cir.1978), are inapposite. In each, counsel failed to respond to the Government's motion for summary judgment. The courts of appeals reversed the denial of the motions for reconsideration so that the merits of the cases could be considered. Here, the district court's entry of summary judgment was not based on Appellants default, and it entered such based on the merits.

decide issues or claims not litigated before the district court."); *Thurman v. Yellow Freight Systems, Inc.*, 97 F.3d 833, 835 (6th Cir.1996) (claims not raised before the district court must be considered waived); *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir.1996) (argument not raised before the district court is not properly before us). The Government's Complaint named all of the parties and included a prayer for injunctive relief against those parties. Appellants were put on notice, therefore, that the Government intended to seek such relief against Paul A. Monea and should have made any objection to the availability of such relief at trial.

Alternatively, in their Reply Brief, Appellants contend that whether or not the Government is correct in its contention that § 335a(b) is inapplicable in this case, the standard for a civil penalty against an individual must be high, requiring more than mere employment, and Paul A. Monea was not subject to injunction because he was not a responsible corporate agent. Just as their argument regarding § 335a(b) was waived, this argument is similarly waived, having not been presented to the district court. *See White*, 899 F.2d at 559. Furthermore, the issue regarding general liability for corporate agents is independently waived, having been raised for the first time in Appellants' Reply Brief. *See Wright v. Holbrook*, 794 F.2d 1152, 1156–57 (6th Cir. 1986).

**2.**

■ In so far as we would be required to consider the argument regarding Paul A. Monea's individual liability as properly appealed, it is also without merit. First, § 335a(b) does not apply to this case. That section concerns the wholly unrelated issue of debarment of individuals for misconduct relating to the development and approval of generic drug products. *See, e.g., Bae v. Shalala*, 44 F.3d 489 (7th Cir.

1995). It neither relates to devices nor addresses injunctions.

■ Second, even the new argument in the Reply Brief relying on general principles is unhelpful to Appellants. According to statements of FDA investigator Frederick Lochner and Paul A. Monea himself, Paul A. Monea was in charge of managing day-to-day activities, J.A. at 780–81, and had supervisory responsibilities. J.A. at 717. Undisputed evidence indicates that he supervised shipping, inventory, and customer service. This role is sufficient to subject him to injunction. *See United States v. Dotterweich*, 320 U.S. 277, 281–84, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (in violations of public health legislation like the FDCA, "[t]he offense is committed . . . by all who have a responsible share in the furtherance of the transaction which the statute outlaws."); *United States v. Park*, 421 U.S. 658, 672, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (same). It cannot be contested on this record that Paul A. Monea was responsible for causing the introduction of Appellants' unlawful products into commerce, and continued such involvement without any effort to come into compliance with the FDCA even after Appellants' products were seized and the FDA undeniably notified Appellants of the need to obtain FDA approval. *See United States v. Hodges X–Ray*, 759 F.2d 557, 560–61 (6th Cir.1985) (applying the *Park* and *Dotterweich* standards in finding an individual personally liable for civil penalties under a statute related to the FDCA). Appellants' argument that Paul A. Monea reported to his father is unavailing. Whether the father had ultimate authority is not the issue. All evidence regarding Paul A. Monea's involvement indicates he maintained various forms of independent authority and responsibility regardless of his father's role. This is sufficient to show that Paul A. Monea shared responsibility for the business process resulting in unlawful distribution and could, therefore, be held criminally liable or liable for civil penalties. *See United States v. Dotterw-*

**760**

*eich*, 320 U.S. 277, 281–84, 64 S.Ct. 134, 88 L.Ed. 48 (1943). Similarly, his role is sufficient to subject himself to injunction, as in this case.

### IV.

■ Below, the Government requested its costs and any such other relief the court deemed proper, including equitable disgorgement of profits.[7] J.A. at 26–27. After finding disgorgement inappropriate, the district court found that restitution was a remedy available to the FDA and appropriate. The district court awarded restitution, finding that the FDCA does not contain a clear command indicating that restitution is not a remedy available to the district court. It supported its decision on the premise that the FDCA should receive liberal construction. *See United States v. An Article of Drug Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). The restitution ordered required Appellants to offer and provide refunds to all of their customers who requested them in writing. J.A. at 50. Appellants challenge the restitution order, arguing the FDCA does not permit restitution and, if it does, restitution was inappropriate in this case.

### A.

The FDCA provides only three remedies for violations: (1) injunctive relief, 21 U.S.C. § 332; (2) criminal prosecution, 21 U.S.C. § 333; and (3) seizure, 21 U.S.C. § 334. To rule on Appellants' first conten-

tion, that the FDCA does not permit orders of restitution, we must consider the scope of injunctive relief authorized under § 332.

■ The district court in this case was sitting as a court of equity. See 21 U.S.C. § 332(a) (granting the district court jurisdiction to restrain violations of FDCA). Restitution and disgorgement are part of courts' traditional equitable authority. *See Mertens v. Hewitt Associates*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (ERISA does not limit available equitable relief); *Porter v. Warner Holding Co.*, 328 U.S. 395, 402, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Heinicke v. Parr*, 168 F.2d 194, 197 (6th Cir.1948) ("[N]othing is more clearly a part of the subject matter of an injunction suit than the recovery of that which has been illegally acquired and which has necessitated injunctive relief."); *Schwartz v. Gregori*, 45 F.3d 1017, 1022–23 (6th Cir.1995) (back pay awarded for retaliatory discharge constituted restitution and was, therefore, an equitable remedy available under ERISA); *Federal Trade Commission v. Gem Merchandising Corp.*, 87 F.3d 466, 469 (11th Cir.1996) ("Among the equitable powers of a court is the power to grant restitution and disgorgement."); *Federal Trade Commission v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir.1991) (restitution); *Federal Trade Commission v. Amy Travel Service, Inc.*, 875 F.2d 564, 570 (7th Cir. 1989) (restitution); *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978) (disgorgement).

---

**7.** Appellants originally claimed that the Government never requested restitution and that, as such, the court should not have ordered the same *sua sponte*. However, as counsel for Appellants conceded during oral argument, the Government's request for "any other such relief" is sufficiently broad language so as to include restitution within its scope.

Federal Rule of Civil Procedure 54(c) provides that, "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." As this

court has recognized, this rule allows a district court to order restitution in an appropriate case even when it has not been requested in the Complaint. *See Shearson/American Express, Inc.v. Mann*, 814 F.2d 301, 307 (6th Cir.1987) (prayer for "such further legal and equitable relief to which Shearson may be entitled" authorizes a district court to order restitution); *Dann v. Studebaker–Packard Corp.*, 288 F.2d 201, 216 (6th Cir.1961) (a plaintiff in equity "is entitled to any relief appropriate to the facts alleged in the bill and supported by the evidence, even where he has not prayed for such relief").

■ Absent a clear command by Congress that a statute providing for equitable relief excludes certain forms of such relief, this court will presume the full scope of equitable powers may be exercised by the courts. In *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) (in analyzing Emergency Price Control Act of 1942), the Supreme Court established that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Id.* at 398, 66 S.Ct. 1086. Porter held that restitution "is within the recognized power and within the highest tradition of a court of equity." *Id.* at 402, 66 S.Ct. 1086. *See also Division No. 1, Detroit, Brotherhood of Locomotive Engineers v. Consolidated Rail Corp.*, 844 F.2d 1218, 1226 (6th Cir.1988) (citing Porter in finding that Railway Labor Act does not alter courts' equitable powers). The court should "not interpret a statute as limiting the equitable jurisdiction of federal courts absent a clear command from Congress to the contrary." *Hadix v. Johnson*, 144 F.3d 925, 936 (6th Cir.1998) (citing, among others, *Porter* in determining that Prison Litigation Reform Act's automatic stay provision should be construed to permit courts to retain their equitable power to suspend stay in accordance with general equitable principles).

This court has made it clear that, if "review of the … statute and its accompanying legislative history fails to reveal a clear congressional intent to displace the equitable powers of the federal courts, [the court] must construe the [statute] as preserving the courts' inherent power." *Hadix*, 144 F.3d at 936–37; *Heinicke*, 168 F.2d at 197 ("the comprehensiveness of equity jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command").

A contrary standard upon which Appellants rely, that the statute must explicitly authorize restitution, was accepted by the Ninth Circuit in *United States v. Parkinson*, 240 F.2d 918 (9th Cir.1956). This approach, however, was rejected by the U.S. Supreme Court in *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 290–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (interpreting Fair Labor Standards Act).[8] *DeMario* held the following:

> The court below took as the touchstone for decision the principle that to be upheld the jurisdiction here contested "must be expressly conferred by an act of Congress or be necessarily implied from a congressional enactment." In this, the court was mistaken. The proper criterion is that laid down in *Porter v. Warner Holding Co.* …. When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of statutory purposes.

*DeMario*, 361 U.S. at 290–92, 80 S.Ct. 332 (citation omitted). The citation in *DeMario* to *Porter*, as well as this circuit's acceptance of the *Porter* approach in *Hadix*, illustrates that Appellants' argument should be rejected. Notably, the *DeMario* Court also recognized that a district court's equitable powers are even broader and more flexible when the public interest is involved, as here. *DeMario*, 361 U.S. at 291, 80 S.Ct. 332 (quoting *Porter*, 328 U.S. at 398, 66 S.Ct. 1086).

■ Appellants also rely on a number of district court cases that determine that recalls and disgorgement are unavailable under the FDCA. *See United States v. C.E.B. Prods., Inc.*, 380 F.Supp. 664 (N.D.Ill.1974) (recalls); *United States v. Superpharm Corp.*, 530 F.Supp. 408 (E.D.N.Y.1981) (recalls); *United States v. Ten Cartons, Ener–B Nasal Gel*, 888

---

**8.** Other courts have also recognized that *Parkinson* was no longer good law after *DeMario*. *See, e.g., ICC v. B & T Transportation Co.*, 613 F.2d 1182, 1184–86 (1st Cir.1980) (rejecting *Parkinson* and *Porter* is settled law).

F.Supp. 381 (E.D.N.Y.1995) (disgorgement), *aff'd. on other grounds,* 72 F.3d 285 (2d Cir.1995). Portions of the legislative history relating to the FDCA indicates that Congress was concerned about the harshness and seriousness of the remedy of seizure. *See, e.g.,* 74 Cong. Rec. 150 (1935); 74 Cong. Rec. 4915 (1935); S.Rep. No. 74–361, at 11 (1935). Injunctive procedures, it is argued, "were viewed as a means to alleviate the hardships seizures might cause to manufacturers." *C.E.B. Prods.,* 380 F.Supp. at 668. *See also Superpharm* (following the reasoning of *C.E.B. Products*); *Ten Cartons,* 888 F.Supp. at 404–05 (following *Superpharm*). Based on that legislative history, the court in *C.E.B. Products* reasoned that a recall provision was probably not within the court's power because it would, in the court's opinion, make an injunction as harsh as a seizure, contrary to the intent of Congress. *See C.E.B. Prods.* 380 F.Supp. at 668. Other district courts, however, have rejected this line of reasoning. *See, e.g., United States v. Barr Laboratories, Inc.,* 812 F.Supp. 458, 489 (D.N.J. 1993); *United States v. K–N Enterprises, Inc.,* 461 F.Supp. 988, 991 (N.D.Ill.1978). *See also United States v. Tri–Bio Laboratories, Inc.,* 700 F.Supp. 223, 225 (M.D.Pa. 1988) (without exercising the power, finding that the court possessed "inherent equitable powers" to order the defendants to bear the costs of FDA inspections); *United States v. Lit Drug Co.,* 333 F.Supp. 990, 997–1000 (D.N.J.1971) (calling for, among other remedies, recall of adulterated and misbranded drugs); *United States v. Lanpar Co.,* 293 F.Supp. 147, 155 (N.D.Tex. 1968) (requiring defendant to recall and destroy illegal products and related literature).

We reject the holdings in the *Parkinson* and *C.E.B. Products* line of cases. First, the existence of the remedy of seizure exists alongside an explicit authorization for injunctive relief to cure violations of the FDCA. The express provision for general equitable relief without the enumeration of any exceptions makes it difficult for this court to find any legitimate means for implicitly carving out such exceptions as we see fit. Even if Congress expressed some concern that seizure should remain the harshest relief available, there is no convincing argument that, in all cases, restitution creates a more harsh result than seizure, procedurally or substantively. Moreover, even accepting the references to legislative concerns relied upon by the *Parkinson* and *C.E.B. Products* line, these concerns are far from a clear statement of Congress's intent to exclude restitution, recalls, disgorgement, or any other traditional form of equitable relief. Finally, as *DeMario* instructs, we must presume that Congress is cognizant of the scope of equity, knows what it is doing when it provides for general equitable relief in a regulatory statute, and can use that knowledge to clearly and explicitly limit the scope of a court's equitable powers under any particular regulatory structure in which such an authorization lies. *See DeMario,* 361 U.S. at 292, 80 S.Ct. 332.

Appellants have not established that the FDCA by "a necessary and inescapable inference, restricts the court's jurisdiction in equity." *DeMario,* 361 U.S. at 291, 80 S.Ct. 332. Nothing in the FDCA explicitly precludes a district court from ordering restitution. To find that restitution is unauthorized, this court "require[s] Congress to make plain its desire to limit the courts' inherent powers because 'the great principles of equity, securing complete justice, should not be yielded to light inferences or doubtful construction.' " *Hadix,* 144 F.3d at 937 (quoting *Porter,* 328 U.S. at 398, 66 S.Ct. 1086). Appellants have not demonstrated that the FDCA or its legislative history "compels a departure from the courts' inherent power to . . . achieve equity." *Hadix,* 144 F.3d at 938. Therefore, we hold that nothing in the FDCA precludes a court sitting in equity from ordering restitution in appropriate cases.

### B.

Next, we must determine whether restitution was an appropriate remedy on

the facts of the case at bar. We review an award of restitution for an abuse of discretion. *SEC v. Johnston*, 143 F.3d 260, 262 (6th Cir.1998).

■ Appellants first argue that the FDA's charge itself should preclude restitution. The FDA charge, they claim, was only that Appellants marketed a product without required approval, rather than that the product didn't perform as it was intended. If the performance is not questioned and no deficiency in the same is established, they contend that there has been no detriment to consumers justifying the restitution order. In other words, Appellants contend that restitution was unwarranted because there is no evidence that consumers received anything less than what they bargained for.

■ The approval process exists to protect consumers' health and their pocketbooks. One of the primary goals of the FDCA is to protect consumers from economic harm. *See* H.R. Conf. Rep. No. 74–2755, at 1 (1938) (one purpose is to prevent "deceit upon the purchasing public"); *United States v. Article, Sudden Change*, 409 F.2d 734, 740 (2d Cir.1969) ("A primary purpose of the Act is the protection of the ultimate consumer's economic interests.") (citing *Federal Security Adm'r v. Quaker Oats Co.*, 318 U.S. 218, 230, 63 S.Ct. 589, 87 L.Ed. 724 (1943); *United States v. Two Bags, Poppy Seeds*, 147 F.2d 123, 126–27 (6th Cir.1945)). It is not the government's burden to prove that a product is not safe and effective. FDCA regulations exist to allow the public to assume that marketed devices have received the imprimatur of FDA approval. To circumvent the law by marketing illegally without approval is to deceive the public both as purchasers and users of the device. In such cases, restitution exists to make the consumer whole. *See In re First Penn Corp.*, 793 F.2d 270, 272 (10th Cir.1986) (object of restitution is "to return the parties to the position that existed before the transaction occurred."). Because restitution seeks to remedy the type of economic

harm to consumers contemplated by the FDCA, it serves goals of the FDCA that are encompassed within the section the FDA charges Appellants violated.

■ Appellants claim that the order of restitution was inappropriately punitive is also without merit. Appellants contend that the district court's statements that the ruling would "send a message" to deter future violations indicates a punitive intent, contrary to the purposes of restitution. The statement, however, merely emphasizes the deterrent effect of the order, an effect consistent with the FDCA's purpose in protecting the public health. "Future compliance may be more definitely assured if one is compelled to restore one's illegal gains." *Porter*, 328 U.S. at 400, 66 S.Ct. 1086. Restitution is not a penalty but instead an award for the benefit of the consumer. *See Woods v. Witzke*, 174 F.2d 855, 856 (6th Cir.1949); *DeMario*, 361 U.S. at 293, 80 S.Ct. 332 (restitution is not punitive because "the measurement of reimbursement is compensatory only"); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 171–72, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (not punishment to require defendants return what they unlawfully obtained). Restitution is directed to "restoring the status quo and ordering return of that which rightfully belongs to the purchaser." *Porter*, 328 U.S. at 402, 66 S.Ct. 1086. Thus, both by its nature and in this case, an order of restitution is not punitive where the offender has violated the law at the expense of the very consumers a restitution order seeks to make whole.

Appellants also claim that restitution is punitive because, unlike disgorgement which removes ill-gotten gain by forcing surrender of profits, restitution requires a return of the entire purchase price, included in which are costs and profits. *See Sec. Exch. Comm'n v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978) ("The purpose of disgorgement is not to compensate the victims of the fraud, but to deprive the

wrongdoer of his ill-gotten gain."). *See also SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102 (2d Cir.1978). Simply because disgorgement and restitution are different, however, does not make restitution punitive. *See SEC v. World Gambling Corp.*, 555 F.Supp. 930, 934 (S.D.N.Y.), *aff'd*, 742 F.2d 1440 (2d Cir. 1983) ("[W]hile disgorgement has been said to serve more important interests than the compensation of investors, that principle is a far cry from the proposition that restitution is an improper end." (internal citation omitted)). Appellants, who disobeyed the law, should not have his expenses covered by consumers. To say that restitution is unavailable is to say that consumers must cover the costs of Appellants' production, advertising, and illegal distribution. Instead, the district court should have the discretion in a case such as this to make the consumers whole rather than allow the illegal activities to stand uncorrected to the consumer's detriment.

Despite Appellants' contentions, their violation was also more than a mere technicality. Congress set up a sophisticated statutory scheme for the regulation of medical devices, and the requirement that devices be approved or cleared by the FDA before marketing is at the heart of the scheme. *See* H.R.Rep. No. 94–853, at 14 (1976). Thus, Appellants' failure to achieve such clearance violates a key component of the regulatory scheme. And, in the context of public health and safety, the district court's equitable authority is broader and more flexible to support such a regulatory scheme than in ordinary litigation.

▮ The district court did not abuse its discretion in determining restitution was appropriate in this case. The district court seemed to fairly balance the equities in the case. There is evidence that Appellants continued to distribute their product without seeking any approval even after they were put on notice of their violation by the FDA in May 1995, J.A. at 91–92, distributed after district court issued a

preliminary injunction, J.A. at 323–25, and obstructed FDA inspections, J.A. at 252, 309–10, 288–89, 281–82. Appellants were hardly mere flies caught in the web of technical government regulation. Appellants marketed a device to the consuming public, a public that the FDCA regulatory structure seeks to protect. Appellants marketed their product in clear violation of the FDCA. They continued to sell to the public even after the FDA notified them that their product could not be sold without FDA approval. For these reasons, the district court's order of restitution was well within its discretion.

### V.

Accordingly, we **AFFIRM** the district court's order of summary judgment in favor of the Government.